# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| HOLLIS TEDFORD, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>EQUITABLE FINANCIAL LIFE INSURANCE COMPANY, THE BENEFITS ADMINISTRATIVE COMMITTEE FOR THE EQUITABLE 401(K) PLAN, and THE INVESTMENT COMMITTEE FOR THE EQUITABLE 401(K) PLAN,<br><br>        Defendants. | **CIVIL ACTION NO.**: |

## <u>COMPLAINT</u>

Plaintiff, Hollis Tedford, ("Plaintiff"), by and through his attorneys, on behalf of the Equitable 401(k) Plan (f/k/a the AXA Equitable 401(k) Plan) (the "Plan"),[1] himself and all others similarly situated, states and alleges as follows:

---

[1] "Effective June 15, 2020, the Plan sponsor, AXA Equitable Life Insurance Company was legally renamed to Equitable Financial Life Insurance Company." Report of Independent Auditors attached to 2020 Form 5500, at 4. The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

## I.   INTRODUCTION

1.   This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, Equitable Financial Life Insurance Company, f/k/a AXA Equitable Life Insurance Company ("Equitable" or the "Company"), the Benefits Administrative Committee for the Plan ("Administrative Committee") and the Investment Committee for the Plan (collectively, the Company, the Administrative Committee and the Investment Committee are referred to as the "Defendants") for breaches of its fiduciary duties.

2.   The Plan is a defined contribution retirement plan, established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34) of ERISA, that enables eligible participants to make tax-deferred contributions from their salaries to the Plan.

3.   To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 333 (3d Cir. 2019).

4.      The Department of Labor ("DOL") has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers."[2]; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) ("*Tibble I*") (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

5.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7.

6.      "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").

7.      Because cost-conscious management is fundamental to prudence in the investment function the concept applies not only to investments, but to a fiduciary's

---

[2] *See* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Sept. 2019), at 2, available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited July 24, 2024).

obligation to continuously monitor all fees incurred by plan participants, including a plan's recordkeeping and administration fees ("RKA").

8.     Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

9.     The Supreme Court recently reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 741 (2022).

10.    Plaintiff alleges that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties it owed to the Plan, to Plaintiff, and to the other participants of the Plan by, *inter alia*, failing to pay reasonable fees for RKA services with respect to the Plan, and failing to objectively and adequately review the Plan's

4

investment portfolio, initially and on an ongoing basis, with due care to ensure that each investment option was prudent, in terms of performance.

11.    At all times during the Class Period, the Plan had over two billion dollars in assets under management. At the start of the Class Period in 2019, the Plan had $2,204,590,363 in assets under management. *See* 2019 Form 5500 for the Plan ("2019 Form 5500"), Schedule H at 2.

12.    By 2023, the Plan had $2,435,965,841 in assets under management. *See* 2023 Form 5500 for the Plan ("2023 Form 5500"), Schedule H at 2.

13.    The Plan's assets under management qualifies it as a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States.  In 2021, only 0.2 percent (1,011 of 641,747) of plans in the country had more than $1 billion in assets under management.[3] In addition, this was true at the start of the Class Period in 2019 where only 0.1 percent (776 of 603,217) of 401(k) plans in the country were as large as the Plan.[4]

---

[3] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at Plans, 2021 at Ex. 1.2, p. 7., available at https://www.ici.org/system/files/2024-08/24-ppr-dcplan-profile-401k.pdf.

[4] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k)    Plans,    2019    at    Ex.    1.2,    p.    7,    available    at https://www.ici.org/system/files/2022-09/22-ppr-dcplan-profile-401k.pdf.

14.     As a jumbo plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.

15.     The Plan is also large in terms of the number of its participants. From 2019 to 2023 it had over 12,000 participants with account balances, with a high of 15,877 participants in 2020. *See* 2020 Form 5500 at 2. In 2021, only 0.1 percent (844 of 641,747) of 401(k) plans in the country were as large as the Plan.[5]

16.     The marketplace for retirement plan services is established and competitive. Accordingly, as a jumbo plan, in addition to the large number of participants, the Plan had substantial bargaining power to obtain high-quality, low-cost RKA services. Defendants, however, did not try to reduce the Plan's expenses to ensure they were prudent until it was too late. Rather, Defendants allowed unreasonable expenses to be charged to participants for RKA services from 2019 through 2021.

17.     With regard to the Plan's investments, Defendants breached their fiduciary duty of prudence by selecting and/or maintaining a certain stable-value investment with lower crediting rates when compared to available similar or

---

[5] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at Plans, 2021 at Ex. 1.2, p. 7., available at https://www.idc.org/system/files/2024-08/24-ppr-dcplan-profile-401k.pdf.

identical investments with higher crediting rates. The crediting rate is the guaranteed rate of return for the investment fund.

18.    Specifically, Defendants allowed substantial assets in the Plan to be invested in the Equitable Fixed Income Fund ("Equitable Fund"), that invested in synthetic guaranteed investment contracts ("GICs") offered by JPMorgan Chase Bank, N.A., State Street Bank & Trust, Prudential Insurance Company of America, American General Life Insurance Company, Nationwide Life Insurance Company, Transamerica Premier Life Insurance Company, Lincoln National Life Insurance Company, Pacific Life Insurance Company, Metropolitan Tower Life Insurance Company, and Massachusetts Mutual Life Insurance Company,[6] (the "Insurance Companies"), that provided significantly lower rates of return than comparable stable value funds that Defendants could have made available to Plan participants.

19.    A prudent fiduciary would not have included this underperforming investment option that also carried significantly more risk than other investment options that had similar goals, *i.e.,* preservation of investment assets.

20.    The Insurance Companies benefited significantly from participants in the Plan investing in the Equitable Fund. A prudent fiduciary who adequately monitored the Plan's investments and placed the interests of participants in the Plan

---

[6] The Massachusetts Mutual Life Insurance Company GIC was an underlying asset in the Equitable Fund in 2022 and 2023 only.

above all would have recognized that the Equitable Fund was benefitting the Insurance Companies at the expense of the participants in the Plan. The investments in the Equitable Fund were held and invested by the Insurance Companies, which kept the spread (the difference between the amount it earned on the investment and the amount it paid to the Plan's participants). The crediting rates that the Insurance Companies provided to the Plan were and are so low that the Insurance Companies reaped a windfall on the spread.

21. During the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties owed to the Plan, to Plaintiff, and to the other participants of the Plan by, *inter alia*, failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost and performance.

22. Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

23. Based on this conduct, Plaintiff asserts claims against Defendants for breach of the fiduciary duty of prudence (Count I) and failure to monitor fiduciaries (Count II).

## II.    JURISDICTION AND VENUE

24.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

25.    This Court has personal jurisdiction over Defendants because the Plan is/was administered in this District meaning Equitable transacts business in this District, resides in this District, and/or has significant contacts with this District, and because ERISA provides for nationwide service of process.

26.    Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Equitable does business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.    PARTIES

### Plaintiff

27.    Plaintiff, Hollis Tedford ("Tedford"), resides in Falmouth, Maine. During his employment, Plaintiff Tedford participated in the Plan. Tedford invested in the Equitable Fund in the Plan and suffered injury to his Plan account due to the

9

significant underperformance of the Equitable Fund. In addition, Plaintiff Tedford also suffered injury to his Plan account by overpaying for his share of RKA costs.

28.    Plaintiff has standing to bring this action on behalf of the Plan because he participated in the Plan and was injured by Defendants' unlawful conduct. Plaintiff is entitled to receive benefits in the amount of the difference between the value of his account currently, or as of the time his account was distributed, and what his account is or would have been worth, but for Defendants' breaches of fiduciary duties as described herein.

29.    Plaintiff did not have knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

### **Defendants**

#### *Company Defendant*

30.    Equitable is the sponsor of the Plan and a named fiduciary of the Plan with a principal place of business at 100 Madison Street, Syracuse, New York. *See* 2023 Form 5500, at 1, filed with the United States Department of Labor. At the start of the Class Period and until at least 2021, the Company's address was 525 Washington Boulevard, Jersey City, New Jersey.  *See* 2021 Form 5500, at 1. Equitable is a financial services and insurance company.

31.     The Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A). Through an employee who holds the title Chief Human Resource Officer appointed the members of the Administrative Committee and the Investment Committee to serve as named fiduciaries of the Plan. *See* Report of Independent Auditors attached to 2023 Form 5500 ("2023 Auditor's Report"), at 5 ("The Chief Human Resource Officer is permitted to appoint Committee members to be responsible for reviewing investment guidelines, monitoring asset managers, selecting asset allocations and investment options for the Plan, and delegating such responsibility as deemed appropriate."). Under ERISA, fiduciaries with the power to appoint have a concomitant fiduciary duty to monitor and supervise their appointees.

32.     Further, at all times, Equitable acted through its officers to perform Plan-related fiduciary functions. These officers were acting in the course and scope of their employment.

33.     Accordingly, Equitable during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Benefits Executive.

### *The Administrative Committee*

34.     The Administrative Committee serves as a plan administrator. *See* 2023 Form 5500, at 2; *see also* 2023 Auditor's Report, at 5 ("The named fiduciar[y] of

11

the Plan [is] the Administrative Committee . . . . The Administrative Committee serves as the Plan administrator.")

35.    Each member of the Administrative Committee during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period, because each had control over Plan management and/or authority or control over management or disposition of Plan assets.

36.    Members of the Administrative Committee during the Class Period are collectively referred to herein as the "Administrative Committee Defendants."

### The Investment Committee

37.    The Investment Committee served as named fiduciary. *See* 2023 Auditor's Report, at 5 ("The named fiduciar[y] of the Plan [is] . . . the Investment Committee Investment Committee

38.    "The Plan's Investment Committee determines the Plan's valuation policies and procedures utilizing information provided by its investment advisors and trustees." Auditor's Report, at 8.

39.    The Investment Committee exercised discretionary control over the management and disposition of the Plan's assets.

40.    The Investment Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29

12

U.S.C. § 1002(21)(A), because each exercised discretionary authority over management or disposition of Plan assets.

41.     The Investment Committee and members of the Investment Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Investment Committee Defendants."

## IV.    CLASS ACTION ALLEGATIONS[7]

42.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and the following proposed class ("Class"):

> All persons, except Defendants and any fiduciary of the Plan and their immediate family members, who were participants in or beneficiaries of the Equitable 401(k) Plan (f/k/a the AXA Equitable 401(k) Plan) at any time between March 31, 2019 to the date of judgment (the "Class Period").[8]

---

[7] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiff to prosecute claims on behalf of the Plan and all participants. *See, e.g., In re: Wilmington Trust Corp.,* 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims). ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

[8] Plaintiff reserves his right to seek modification of the close of the Class Period in the event that further investigation/discovery reveals a more appropriate end period.

43.    The members of the Class are so numerous that joinder of all members is impractical. The 2023 Form 5500 lists 12,916 Plan "participants with account balances as of the end of the plan year." 2023 Form 5500, at 2.

44.    Plaintiff's claims are typical of the claims of the members of the Class. Like other Class members, Plaintiff participated in the Plan and has suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiff consistently with other Class members, and managed the Plan as a single entity. Plaintiff's claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

45.    There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A.    Whether Defendants are a fiduciary of the Plan;

B.    Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

C.    The proper form of equitable and injunctive relief; and

D.    The proper measure of monetary relief.

46.    Plaintiff will fairly and adequately represent the Class, and has retained counsel experienced and competent in the prosecution of ERISA class action

14

litigation. Plaintiff has no interests antagonistic to those of other members of the Class. Plaintiff is committed to the vigorous prosecution of this action, and anticipates no difficulty in the management of this litigation as a class action.

47.    This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

48.    In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.    THE PLAN

49.    "The Plan is a defined contribution plan with a cash or deferred arrangement providing benefits for eligible common-law employees and statutory

employees of Equitable and certain participating affiliates." 2023 Auditor's Report, at 5.

50.    "The Plan covers full-time employees, "Group I" part-time employees, financed financial professionals, and statutory employees, as well as other employees of Equitable and employees of certain participating affiliates who are scheduled to work a minimum of 1,000 hours in a Plan year." *Id*.

51.    "Eligible new hires are automatically enrolled in the Plan after performing one hour of service." *Id*.

52.    "The Plan allows participants to invest in the Equitable Fixed Income Fund (the "Fund"), which is a separately managed account consisting of synthetic Guaranteed Investment Contracts ("GICs")." *Id*., at 11.

53.    At the end of 2019, $461,965,621 in Plan assets were invested in the Equitable Fund. *See* 2019 Auditor's Report, at 13.

54.    In 2019, the Equitable Fund consisted of nine GICs (JPMorgan, State Street, Prudential, American General, Nationwide, Transamerica, Lincoln National, Pacific Life, and Metropolitan Tower). *See id*.

55.    By the end of 2023, over $373 million in Plan assets were invested in the synthetic CIGs in the Equitable Fund. *See* 2023 Auditor's Report, at 13.

## VI.    THE TOTALITY OF THE CIRCUMSTANCES DEMONSTRATES THAT DEFENDANTS FAILED TO ADMINISTER THE PLAN IN A PRUDENT MANNER

**A.    ERISA Fiduciaries Are Held to the Highest Standards Regarding Process and Methodology of Evaluating Investments**

56.    As described in the "Parties" section above, Defendants are/were fiduciaries of the Plan.

57.    ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exist "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 142 S. Ct. at 741.

58.    As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. …" DOL 408(b)(2) Regulation Fact Sheet.

59.    The duty "…to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[9]

60.    Acting in the sole interest of plan participants is all encompassing. A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. *See* the U.S. Department of Labor, Employee Benefits Security Administration (EBSA)'s "Meeting Your Fiduciary Responsibilities," at 2 ("The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. It requires expertise in a variety of areas, such as investments."), available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

61.    A prudent investment professional, and hence a fiduciary, must regularly evaluate a fund's performance history, the portfolio manager's experience and tenure, changes to the fund's investment strategy, changes to the underlying assets in the investment, total assets under management within the fund, fees, and other relevant factors.

---

[9] Available at
https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain.

18

62.   With respect to investment returns, diligent investment professionals monitor the performance of their selected investments using appropriate industry-recognized "benchmarks" and prudently managed equivalents.

63.   The measurement of investments against prudently managed alternatives is critical given that these alternatives represent other investments available to a plan, which may increase the likelihood that participants reach/live their preferred lifestyle in retirement.

64.   Whether a plan fiduciary enlists the assistance of an investment manager, consultant, or advisor, the plan's fiduciaries are not relieved of fiduciary liability for selecting and monitoring the plan's investment options.

65.   It is black letter law that a fiduciary's duty to conduct an "independent investigation into the merits of a particular investment," is the "most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Circ. 1996). *Hughes*, 142 S. Ct. at 738 (noting ERISA fiduciaries are required to "conduct their own independent evaluation to determine which investments may by prudently included in the plan's menu of options.").

66.   To the extent plan fiduciaries have adopted an investment policy statement, those fiduciaries "must comply with the plan's written statements of investment policy, insofar as those written statements are consistent with the provisions of ERISA." *Lauderdale v. NFP Retirement, Inc.*, 2022 WL 17260510, at

19

* 10 (S.D. Cal. Nov. 17, 2022). That is, the investment policy statement must be written with the sole interest of the plan participant in mind.

67.    Plaintiff did not have and does not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing the Plan's investments because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

68.    Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. But in most cases, even that is not sufficient. For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence. Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether

20

there were any methods whatsoever." *Sacerdote v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

69.    For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these processes and methods based upon several factors as described below.

70.    Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the selection (and maintenance) of the Equitable Fund in the Plan throughout the Class Period that wasted the assets of the Plan and the assets of participants because of unnecessary costs and underperformance.

### B.    Defendants Breached Their Fiduciary Duties by Causing the Plan to Offer the Equitable Fund

#### 1.    Overview of GICs

71.    For defined-contribution retirement plans, stable value investments are intended to provide participants with an option that protects their assets and is shielded from risks of loss, hence why they are called Guaranteed Investment Contracts or GICs.

72.    GICs are issued by insurance companies in the form of a fixed annuity contract. Pursuant to the terms of those contracts, the GICs provide for a guaranteed rate of return or "crediting rate" during a specified period.

73. Large plans often offer "synthetic" stable value funds, like the Equitable Fund.

### 2. The Plan's Inclusion of Equitable Fund

74. At all relevant times, Defendants maintained the authority to exercise control over the Plan's investments, including the Plan's Equitable Fund.

75. The Insurance Companies establish the crediting rates for their underlying GICs with the Plan.

76. The Insurance Companies earn a "spread" equal to the difference between the crediting rate and the returns the Insurance Companies earn on the funds in their accounts.

### 3. There are Many GICs in the Marketplace with Competitive Crediting Rates

77. The marketplace for GICs is robust with many insurance companies offering GICs with competitive rates.

78. Throughout the Class Period, identical or substantially identical stable value funds with higher crediting rates, and hence lower spreads, were available to the Plan, but were not selected by Defendants.

79. The Equitable Fund in the Plan had underwhelming crediting rates when compared against stable value GICs provided by other comparable carriers for other retirement plans:

22

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate[10] |
|------|-----------|---------------------|-------------|-------------------|--------------------|
| **2019** | Baylor College of Medicine Retirement Plan | 12,587 | $1,278,730,175 | Lincoln Financial Group | 4.29% |
| | Jackson National Life Insurance Company Defined Contribution Plan | 5,002 | $1,090,110,381 | Jackson National Life Insurance | 4.28% |
| | Holzer Health System 401(a) Profit Sharing Plan | 1,896 | $179,609,420 | American United Life Insurance Company | 3.98% |
| | Transamerica 401(k) Retirement Savings Plan | 15,140 | $2,020,965,905 | Transamerica Financial Life Insurance Company | 3.85% |
| | American United Life Progress Sharing Plan and Trust | 3,051 | $377,919,056 | American United Life Insurance Company | 3.70% |

---

[10] For crediting rates not identified in the plans' Form 5500s, the calculated yield is interest credited divided by the end of year balance.

| | | | | Massachusetts Mutual Life Insurance Company | 3.56% |
|---|---|---|---|---|---|
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,515 | $355,957,124 | | |
| | **AXA Equitable 401(k) Plan** | **15,639** | **$2,204,590,363** | **The Prudential Insurance Company of America** | **3.18%** |
| | | | | **American General Life Insurance Company** | **2.78%** |
| | | | | **Nationwide Life Insurance Company** | **2.77%** |
| | | | | **JPMorgan Chase Bank, N.A.** | **2.76%** |
| | | | | **Transamerica Premier Life Insurance Company** | **2.76%** |
| | | | | **State Street Bank & Trust** | **2.75%** |
| | | | | **Lincoln National Life Insurance Company** | **2.75%** |
| | | | | **Pacific Life** | **2.26%** |
| | | | | **Metropolitan Tower Life Insurance Company** | **0.40%** |
| 2020 | Baylor College of Medicine Retirement Plan | 12,905 | $1,493,377,139 | Lincoln Financial Group | 4.16% |
| | Alina 401(k) Retirement Savings Plan | 32,203 | $2,690,046,457 | Brighthouse Life Insurance Company | 3.72% |

24

| | | | | | |
|---|---|---|---|---|---|
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,711 | $428,308,461 | Massachusetts Mutual Life Insurance Company | 3.56% |
| | American United Life Progress Sharing Plan and Trust | 2,699 | $435,970,029 | American United Life Insurance Company | 3.54% |
| | **Equitable 401(k) Plan** | **15,877** | **$2,374,376,828** | **The Prudential Insurance Company of America** | **2.52%** |
| | | | | **American General Life Insurance Company** | **2.12%** |
| | | | | **Nationwide Life Insurance Company** | **2.38%** |
| | | | | **JPMorgan Chase Bank, N.A.** | **2.52%** |
| | | | | **Transamerica Premier Life Insurance Company** | **2.31%** |
| | | | | **State Street Bank & Trust** | **2.39%** |
| | | | | **Lincoln National Life Insurance Company** | **2.01%** |
| | | | | **Pacific Life** | **2.02%** |
| | | | | **Metropolitan Tower Life Insurance Company** | **1.82%** |
| 2021 | Gemba Group Annuity Plan | 969 | $118,565,852 | National Ohio Financial Services | 4.97% |

| Plan | Participants | Assets | Provider | Percentage |
|---|---|---|---|---|
| Baylor College of Medicine Retirement Plan | 13,391 | $1,692,013,731 | Lincoln Financial Group | 4.23% |
| Holzer Health System 401(a) Profit Sharing Plan | 2,017 | $203,815,263 | American United Life Insurance Company | 4.02% |
| American United Life Progress Sharing Plan and Trust | 3,183 | $493,267,284 | American United Life Insurance Company | 3.87% |
| Gemba Group Annuity Plan | 969 | $118,565,852 | Principal Life Insurance Company | 3.84% |
| **Equitable 401(k) Plan** | **13,510** | **$2,621,769,910** | **The Prudential Insurance Company of America** | **1.86%** |
| | | | **American General Life Insurance Company** | **1.86%** |
| | | | **Nationwide Life Insurance Company** | **1.86%** |
| | | | **JPMorgan Chase Bank, N.A.** | **1.86%** |
| | | | **Transamerica Premier Life Insurance Company** | **1.86%** |
| | | | **State Street Bank & Trust** | **1.86%** |
| | | | **Lincoln National Life Insurance Company** | **1.86%** |

26

| | | | | Pacific Life | 1.70% |
| | | | | Metropolitan Tower Life Insurance Company | 1.63% |
| | | | | | |
| 2022 | International Imaging Materials Inc. Retirement and Investment Plan | 445 | $59,443,888 | Lincoln National Life Insurance Co. | 4.89% |
| | Baylor College of Medicine Retirement Plan | 14,036 | $1,434,738,254 | Lincoln Financial Group | 4.37% |
| | American United Life Progress Sharing Plan and Trust | 3,235 | $439,262,320 | American United Life Insurance Company | 3.90% |
| | Jackson National Life Insurance Company Defined Contribution Plan | 4,650 | $1,149,061,601 | Jackson National Life Insurance | 3.83% |
| | Alina 401(k) Retirement Savings Plan | 34,554 | $2,678,277,538 | Brighthouse Life Insurance Company | 3.69% |

| | | | | | |
|---|---|---|---|---|---|
| | Trugreen Profit Sharing and Retirement Plan | 11,408 | $371,495,784 | Massachusetts Mutual Life Insurance Company | 3.67% |
| **Equitable 401(k) Plan** | | **13,104** | **$2,174,972,449** | **State Street Bank & Trust** | **2.85%** |
| | | | | **American General Life Insurance Company** | **1.88%** |
| | | | | **The Prudential Insurance Company of America** | **1.88%** |
| | | | | **Pacific Life** | **1.88%** |
| | | | | **JPMorgan Chase Bank, N.A.** | **1.88%** |
| | | | | **Metropolitan Tower Life Insurance Company** | **1.88%** |
| | | | | **Nationwide Life Insurance Company** | **1.68%** |
| | | | | **Lincoln National Life Insurance Company** | **1.49%** |
| | | | | **Massachusetts Mutual Life Insurance Company** | **1.43%** |
| | | | | **Transamerica Life Insurance Company** | **0.33%** |

28

| | | | | | |
|---|---|---|---|---|---|
| 2023 | Valley Hospital Retirement Defined Contribution Plan | 4,282 | $550,230,744 | Lincoln National Life Insurance Co. | 4.57% |
| | Mattel, Inc. Personal Investment Plan | 7,427 | $1,167,576,000 | Metropolitan Tower Life Insurance Co. | 3.71% |
| | Pomona Valley Hospital Medical Center Retirement Savings Plan | 4,219 | $525,201,271 | Lincoln National Life Insurance Co. | 3.64% |
| | Auto-Owners Insurance Company Retirement Savings Plan | 8,582 | $772,874,102 | Auto-Owners Life Insurance Company | 3.48% |
| | **Equitable 401(k) Plan** | **12,916** | **$2,435,965,841** | **Lincoln National Life Insurance Company** | **2.28%** |
| | | | | **The Prudential Insurance Company of America** | **2.28%** |
| | | | | **Metropolitan Tower Life Insurance Company** | **2.28%** |
| | | | | **Pacific Life** | **2.28%** |
| | | | | **Nationwide Life Insurance Company** | **2.45%** |

29

| | | | | State Street Bank & Trust | 2.28% |
| | | | | JPMorgan Chase Bank, N.A. | 2.28% |
| | | | | American General Life Insurance Company | 2.28% |
| | | | | Massachusetts Mutual Life Insurance Company | 2.29% |
| | | | | Transamerica Life Insurance Company | 2.28% |

80.   Throughout the Class Period, the Equitable Fund underperformed the comparator funds by an average of almost 48% as demonstrated in the table below.

| Year | Equitable Fund Average Rate of Return | Comparator Average Rate of Return | Equitable Fund Percentage of Underperformance |
|---|---|---|---|
| 2019 | 2.40% | 3.94% | 39.09% |
| 2020 | 2.20% | 3.75% | 41.33% |
| 2021 | 1.67% | 4.19% | 60.14% |
| 2022 | 1.59% | 4.06% | 60.84% |
| 2023 | 2.37% | 3.85% | 38.44% |
| Average Underperformance during Class Period | | | 47.97% |

81.   In short, because the Plan held over $2 billion in assets under management at the start of the Class Period, it had considerable leverage to bargain for higher crediting rates.

82.   A prudent fiduciary would have known that other providers of fixed annuities offer substantially identical, better-performing stable value investments. A

30

prudent fiduciary could have accomplished this goal by demanding higher crediting rates from the Insurance Companies and/or by submitting requests for proposals to the Insurance Companies and other providers of stable value investments.

83.    By selecting the Equitable Fund with underperforming crediting rates, Defendants failed to provide participants with an option that maximized the value of their investments.

84.    With the massive amount of assets under management in the Equitable Fund, the losses suffered by Plan participants were devastating.  Every additional expense imposed upon the participants compounds and reduces the value of their retirement savings over time. *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015). For example, a 1% higher fee over 35 years makes a 28% difference in retirement assets at the end of a participant's career.[11]

### C.    The Plan's RKA Fees During the Class Period Were Excessive and Unreasonable

85.    "The duty to pay only reasonable fees for plan services and to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.

---

[11] Look at 401(k) Plan Fees, UNITED STATES DEPT. OF LABOR at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource center/publications/401k-plan-fees.pdf (accessed Feb. 14, 2025).

86.    As demonstrated below, Defendants failed to adequately review the Plan's RKA fees in a timely manner to ensure the Plan and its participants were paying reasonable RKA fees.

### 1.    ERISA's Fee Disclosure Rule

87.    In January 2012, the DOL issued a final regulation under Section 408(b)(2) of ERISA which requires a "covered service provider" to provide the responsible plan fiduciary with certain disclosures concerning fees and services provided to certain of their ERISA governed plans. This regulation is commonly known as the service provider fee disclosure rule, often referred to as the "408(b)(2) Regulation."[12]

88.    The required disclosures must be furnished in advance of a plan fiduciary entering into or extending a contract or arrangement for covered services. The DOL has said that having this information will permit a plan fiduciary to make a more informed decision on whether or not to enter into or extend such a contract or arrangement.

89.    For example, in order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including

---

[12]    *See*    https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/final-regulation-service-provider-disclosures-under-408b2.pdf ("DOL 408(b)(2) Regulation Fact Sheet").

direct compensation and revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

90. The 408(b)(2) disclosures in short require a service provider to disclose the services it provides and the fees it collects for such services so that sponsors can determine the reasonableness of the arrangement.

91. A plan's participants do not have access to the disclosures provided to fiduciaries under the 408(b)(2) Regulation.

92. Instead, plan administrators have a separate obligation under 29 CFR § 2550, 404a-5 to disclose plan-related information, including fees for certain services to participants. Among other things, fiduciaries are required to provide plan participants "[a] description of the services to which the charges relate (*e.g.*, plan administration, including recordkeeping, legal, accounting services)." 29 CFR § 2550.404a-5(C)(2)(ii)(B).

> **2. Costs for Recordkeeping Services Vary Little Between Competing Providers for a Plan with a Substantial Number of Participants**

93.    The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Recordkeeping and administrative services fees are one and the same and the terms are used synonymously herein and referred to as RKA.

94.    There are two types of essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan). First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

A.    Basic account recordkeeping (e.g. demographic, source, investment and vesting records);

B.    Multi-channel participant and plan sponsor access (e.g. phone, web);

C.    Daily participant transaction accounting (e.g., purchases, redemptions, exchanges);

D.    Payroll service (e.g. hardships, in-service withdrawals, termination distributions);

E.    Participant tax reporting services (e.g., IRS Form 1099-R);

34

F.    Participant confirmations, statements, and standard notices;

G.    Plan-level reporting and annual financial package (excluding IRS Form 5500);

H.    Participant education (e.g. newsletters, web articles, standard communication materials);

I.    Plan consulting (e.g., preapproved document services, operational materials);

J.    Plan consulting (e.g. preapproved document services, operational compliance support).

95.    This suite of essential recordkeeping services can be referred to as "Bundled" services. These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan. As explained in more detail below, the services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.

96.    The second type of essential recordkeeping services, hereafter referred to as "A La Carte" services, provided by all national recordkeepers, often has separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants. These fees are distinct from the bundled arrangement described above to ensure that one participant is not forced to

help another cover the cost of, for example, taking a loan from their plan account balance. These A La Carte services typically include, but are not limited to, the following:

       a.     Loan processing;

       b.     Brokerage services/account maintenance (if offered by the plan);

       c.     Distribution services; and

       d.     Processing of qualified domestic relations orders.

97.     All national recordkeepers have the capability to provide all of the aforementioned recordkeeping services at very little cost to all large defined contribution plans, including those much smaller than the Plan. In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers.

98.     The cost of providing recordkeeping services depends in large part on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. *See* 1998 DOL Study,[13] at 4.2.2. ("Basic per-participant administrative charges typically reflect minimum charges and sliding scales that

---

[13] https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf ("1998 DOL Study").

substantially reduce per capita costs as plan size increases."). When more participants in a plan are on a recordkeeping platform, the recordkeeper allocates its fixed costs over a larger participant base, which reduces the per-participant cost. As a result, the cost to add a new participant to a plan is relatively low. And as the overall number of participants increases, the average cost per participant decreases. ***Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.***[14]

99.    In general, the level, number and character of participant services provided by the recordkeeper have minimal impact upon the costs of providing recordkeeping. That is because building and maintaining a robust, intuitive, web-based participant interactive 401(k) account system incurs large fixed costs. Each additional participant placed on the system causes a minimal incremental/marginal cost to the record keeper ***notwithstanding the level, number and character of the services provided to that additional participant.***

100.    Recordkeepers for large 401(k) plans such as Fidelity, Vanguard, Empower, Alight, and Voya, among others, invest in technology infrastructure

---

[14] "[T]he actual cost of administrative services is more dependent on the number of participants in the plan." There is no "logical or practical correlation between an increase in administrative fees and an increase in plan assets." Hewitt Associates, LLC, *Be a Responsible Fiduciary: Ask the Right Questions About 401(k) Plan Fees*, Oct. 2008; *see also* Mercer Investment Consulting, Inc., *DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance* (2013), https://www.mercer.com/content/dam/mercer/.

necessary to provide recordkeeping and transaction services to all clients (*e.g.,* website, call center, and some print services).

101. Accordingly, a plan sponsor or fiduciary has the leverage to negotiate favorable rates given that costs of implementation do not change for the service provider.

### 3. Much of the Information Regarding the Reasonableness of Fees for Recordkeeping Services is in the Sole Possession of Plan Fiduciaries

102. As noted above, 408(b)(2) disclosures provided to plan sponsors and fiduciaries are generally not made available to plan participants. The same is true for Plaintiffs and this Plan, as Plaintiffs do not have access to any 408(b)(2) disclosures that may have been received by the Plan's fiduciaries.

103. Other information has also not been made available to Plaintiffs. For example, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.

104. More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase

in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

105.   Cerulli Associates stated in early 2012 that more than half of the plan sponsors asked indicated that they "are likely to conduct a search for [a] recordkeeper within the next two years." These RFPs were conducted even though many of the plan sponsors indicated that "they have no intention of leaving their current recordkeeper."[15]

106.   Generally, any RFPs, if conducted, would not be made available to plan participants. The same is true for Plaintiffs here who do not have direct access to such information.

107.   Additionally, documentation of fiduciary fee monitoring is generally accomplished in the form of the above-mentioned meeting minutes which Plaintiffs asked for pre-suit from the Plan administrator, but their request was denied.

108.   In short, Plaintiff did not have and does not have actual knowledge of the specifics of Defendants' decision-making process with respect to review of the Plan's fees, including Defendants' processes (and execution of such) for monitoring

---

[15] "Recordkeeper Search Activity Expected to Increase Within Next Two Years," *Cerulli Assoc.*, January 8, 2013, https://www.plansponsor.com/most-recordkeeping-rfps-to-benchmark-fees/.

recordkeeping and administration costs, because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

109. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding the fiduciary processes related to monitoring RKA fees based upon information available to Plaintiffs, such as Rule 404a disclosures, Form 5500s filed with the DOL, market surveys, and other authority.

> **D.    Circumstantial Facts and Evidence Plausibly Show that the Plan Paid Unreasonable RKA Fees and/or Defendants Failed to Engage in a Prudent Process to Evaluate RKA Fees**

> **1.    The Plan's Recordkeeper Offered Routine Services**

110. The RKA services performed for the Plan from 2019 through 2021, when Alight Solutions LLC ("Alight") was the recordkeeper, were similar so we can look at the Plan's 2020 Form 5500, Schedule C as an example year. The Schedule C lists the following codes indicating the type of general services performed by the recordkeeper: 15, 50, and 59. Below is a description of the recordkeeping codes:

> 15 – Recordkeeping and information management (computing, tabulating, data processing etc.)

50 – Direct payment from the plan

59 – Shareholder servicing fees

*See* Instructions for the 2023 Schedule C (Form 5500) available at https://www.dol.gov/sites/dolgov/files/ebsa/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2023-instructions.pdf at 27-31.

111.  Again, the above services are not out of the ordinary of the services other national recordkeepers provide. Any fees associated with other ancillary a la carte services performed by the recordkeeper would be negligible because it is on a participant-by-participant basis instead of plan-wide.

112.  Further, Plan sponsors have great discretion and essentially no guidance in selecting the recordkeeping codes for the Schedule C. *See* Instructions for the 2023 Schedule C (Form 5500) at 30 ("Select from the list below all codes that describe both the kind of services provided and the type of compensation received. Enter as many codes as apply").

113.  The service codes identified on Schedule C are often unreliable because of inconsistencies in how the codes are interpreted and applied by different service providers. For example, all recordkeepers provide recordkeeping and information management, as well as communications to plan participants. However, Capital Group did not identify service code 15 – "Recordkeeping and information

41

management (computing, tabulating, data processing, etc.)" or service code 38 – "Participant communication" on the Schedule C throughout the Class Period.

114.  These inconsistencies regarding services provided to a plan make it difficult to compare services across different plans.

115.  Alight is considered a major recordkeeper in the marketplace, and one of the top ten recordkeepers in the marketplace, which includes Fidelity, Empowers, the Vanguard Group, Principal Financial Group, Voya Financial, T. Rowe Price, Prudential Financial, Inc., Bank of American Corporation and Charles Schwab. *See* https://www.runnymeade.com/blog/401k-providers-2020-top-10-lists.

116.  These recordkeepers, including Alight, are all capable of providing the same quality of service and they must do so to succeed in the very highly competitive 401(k) service provider arena. Had the Defendants genuinely sought a competitive rate, the Plan participants would have benefited from a significant reduction in RKA costs.

### 2.    There is No Indication That Defendants Negotiated to Reduce the Plan's Recordkeeping Fees

117.  As noted above, 408(b)(2) disclosures are not available to plan participants. By the same token, because 408(b)(2) disclosures are provided from a service provider to its client, the disclosures are not available to any other plan fiduciary either. Accordingly, as noted above, the best way for a Plan fiduciary (as

opposed to a plan participant) to determine whether a plan is paying reasonable recordkeeping fees is to conduct a RFP.

118. Here, the fact that the Plan paid the relatively same amount of excessively high recordkeeping fees from 2019 to 2021, there is little to suggest that Defendants conducted an RFP, or at least an effective one, at reasonable intervals to determine whether the Plan could obtain better recordkeeping and administrative fee pricing from other service providers given that the market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service

119. Had the Defendants genuinely sought a competitive rate, the Plan participants would have benefited from a significant reduction in RKA costs.

> **3.    The Plan's Recordkeeping Fees were/are Unreasonable When Benchmarked Against Other Similarly Situated Plans and Within the Context that Plan Recordkeeping Fees Should Decline as Plan Size Increases**

120. Because recordkeeping costs are not affected by account size, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees as a fixed dollar amount rather than as a percentage of assets. *See* Mercer Best Practices at 3. Otherwise, as plan assets grow, the recordkeeping compensation increases without any change in the recordkeeping services, leading to unreasonable fees.

43

121.   As demonstrated in the charts below, the Plan's participants were saddled with above-market administrative and recordkeeping fees since well before the start of the Class Period and up to at least 2021.

| Plan Year | Recordkeeper | Participants | Schedule C Codes | Total RKA Reported[16] | PP$ |
|---|---|---|---|---|---|
| 2021 | Alight | 13,510 | 15, 50, 59 | $970,892 | $71.86 |
| 2020 | Alight | 15,877 | 15, 50, 59 | $736,723 | $46.40 |
| 2019 | Alight | 15,639 | 15, 50, 59 | $1,018,118 | $65.10 |
| 2018 | Alight | 15,445 | 15, 50, 59 | $1,025,333 | $66.39 |
| 2017 | Hewitt Associates, LLC[17] | 15,410 | 15, 50, 59 | $1,167,675 | $75.77 |
| 2016 | Hewitt Associates, LLC | 15,197 | 15, 50, 59 | $957,353 | $63.00 |
| 2015 | Hewitt Associates, LLC | 14,103 | 15, 50, 59 | $981,170 | $69.57 |
| 2014 | Hewitt Associates, LLC | 14,060 | 15, 50, 59 | $1,054,249 | $74.98 |
| 2013 | Hewitt Associates, LLC | 14,022 | 15, 50, 59 | $1,263,420 | $90.10 |
| 2012 | Hewitt Associates, LLC | 15,075 | 15, 50, 59 | $1,252,739 | $83.10 |

122.   The above fees were astronomical when benchmarked against similar plans.

---

[16] To keep the total fees consistent with the comparator plans analyzed below, the total fee was determined by adding any amounts reported on Schedule C of the Plan's 5500s which are reported as either direct or indirect costs and which are coded in the categories discussed above as common RKA coding which include but are not limited to 15, 50 and 59. Excluded from these amounts are any amounts reported as, including but not limited to, trustee, legal, accounting and/or consulting fees. Although no indirect costs are reported it is expected that once the total amount of revenue sharing is known this amount will increase.

[17] "The benefits outsourcing unit formerly part of insurance broker Aon Plc and sold to Blackstone Group LP in February has officially re-launched as Alight." *See* "Alight, formerly part of Aon Hewitt, seeks to expand its cloud services portfolio" June 7, 2017.

123.   At all times during the Class Period a per participant fee in excess of $45 was unreasonable. As noted above, a DOL study concluded that "[b]asic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases." Accordingly, the larger the plan, the lower the recordkeeping fee should be. To put things into perspective, when comparing retirement plan data, most publications utilize tranches. For example, the leading publication that collects 403(b) data is BrightScope/ICI. It categorizes plans in the following tranches:

*See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at Plans, 2019 at Ex. 1.2, p. 7., available at https://www.ici.org/system/files/2023-04/23-ppr-dcplan-profile-403b.pdf.

EXHIBIT I.4

**Audited ERISA 403(b) Plans and the Universe of ERISA 403(b) Plans by Plan Assets**
Distribution of 403(b) plans, participants, and assets by plan assets; 2019

| | BrightScope audited 403(b) filings | | | Department of Labor 403(b) universe | | |
|---|---|---|---|---|---|---|
| Plan assets | Plans | Participants Thousands | Assets Billions of dollars | Plans | Participants Thousands | Assets Billions of dollars |
| Less than $1M | 227 | 48.1 | $0.1 | 7,193 | 209.3 | $2.6 |
| $1M to $10M | 2,583 | 705.2 | 12.3 | 7,304 | 987.9 | 26.1 |
| >$10M to $50M | 2,069 | 860.1 | 48.2 | 2,329 | 907.1 | 52.4 |
| >$50M to $100M | 518 | 433.9 | 36.5 | 536 | 450.8 | 37.7 |
| >$100M to $250M | 432 | 754.9 | 67.4 | 440 | 781.4 | 68.7 |
| >$250M to $500M | 191 | 751.8 | 67.7 | 196 | 785.6 | 69.2 |
| >$500M to $1B | 111 | 759.5 | 77.9 | 115 | 801.4 | 81.1 |
| More than $1B | 108 | 2,092.0 | 262.5 | 109 | 2,121.6 | 264.0 |
| All plans | 6,239 | 6,405.6 | 572.6 | 18,222 | 7,045.1 | 601.8 |

Note: Audited 403(b) filings generally include plans with 100 participants or more. Assets are fair market value at the year-end of the plan and include loans.
Source: BrightScope Defined Contribution Plan Database

124.   Accordingly, the billion-dollar asset mark is significant as all plans over a billion dollars are considered in a category of their own.  Additionally, plans with over 10,000 participants are also considered as in the same category.

125.   Looking at recordkeeping costs for plans similar in size to the assets and participant size of the Plan during the Class Period shows that the Plan was paying higher recordkeeping fees than its peers.

| Recordkeeper | Plan Name | Plan Year | Assets Under Management | Participants | Schedule C Codes | Indirect Compensation | Cost Per Participant[18] |
|---|---|---|---|---|---|---|---|
| T. Rowe Price | Thermo Fisher Scientific Inc. 401(k) Retirement Plan | 2019 | $5,675,354,000 | 42,339 | 15 21 25 28 33 37 38 49 50 52 55 59 62 64 65 | Yes - $0 | $9 |
| Great-West Life | Deseret 401(k) Plan | 2019 | $4,264,113,298 | 34,938 | 64 | Yes - $0 | $22 |
| Fidelity | The Dow Chemical Company Employees' Savings Plan | 2019 | $10,913,979,302 | 37,868 | 37 50 64 60 65 | Yes - $0 | $25 |
| Vanguard/ Prudential | Philips North America 401(k) Plan | 2019 | $4,898,009,752 | 28,428 | 15 37 50 65 99 | Yes - $0 | $25 |
| Fidelity | Danaher Corporation & Subsidiaries Savings Plan | 2019 | $5,228,805,794 | 33,116 | 37 64 65 71 | Yes - $0 | $34 |
| Fidelity | First American Financial Corporation 401(k) Savings Plan | 2019 | $1,791,281,396 | 15,246 | 37, 60, 64, 65, 71 | Yes - $0 | $35 |
| Great-West Life/ TIAA | Penn State Health 401(k) Savings Plan | 2019 | $1,646,231,456 | 15,020 | 64 | Yes - $0 | $35 |
| **Alight** | **AXA Equitable 401(k) Plan** | **2019** | **$2,204,590,363** | **15,639** | **15 50 59** | **Yes - $0** | **$65** |
| Vanguard | FedEx Office and Print Services, Inc. 401(k) Retirement Savings Plan | 2020 | $1,051,387,744 | 19,354 | 15, 25, 50, 16, 26, 52, 21, 37, 57 | Yes - $0 | $23 |

---

[18] These fees are taken from the Form 5500s.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| T. Rowe Price | Thermo Fisher Scientific Inc. 401(k) Retirement Plan | 2020 | $6,618,601,000 | 43,691 | 15 21 25 28 37 38 49 50 52 59 62 64 65 99 | Yes - $0 | $25 |
| Prudential | Philips North America 401(k) Plan | 2020 | $5,663,746,665 | 28,348 | 15 37 50 65 99 | Yes - $0 | $25 |
| Fidelity | Sutter Health 403(b) Savings Plan | 2020 | $5,564,538,096 | 67,149 | 37 60 64 65 | Yes - $0 | $26 |
| Fidelity | Danaher Corporation & Subsidiaries Savings Plan | 2020 | $6,148,370,238 | 35,467 | 37 64 65 71 | Yes - $0 | $30 |
| Vanguard | Kaiser Permanente Supplemental Savings and Retirement Plan | 2020 | $4,523,681,952 | 48,263 | 15 25 26 37 38 53 | Yes - $0 | $38 |
| **Alight** | **Equitable 401(k) Plan** | **2020** | **$2,374,376,828** | **15,877** | **15 50 59** | **Yes - $0** | **$46** |
| | | | | | | | |
| T. Rowe Price | Thermo Fisher Scientific Inc. 401(k) Retirement Plan | 2021 | $7,716,713,000 | 51,325 | 15 21 25 28 33 37 38 49 50 52 55 59 62 64 65 | Yes - $0 | $13 |
| Fidelity | Sutter Health 403(b) Savings Plan | 2021 | $6,372,464,202 | 66,814 | 37 60 64 65 71 | Yes - $0 | $25 |
| Prudential | Philips North America 401(k) Plan | 2021 | $6,384,324,582 | 30,245 | 15 37 50 65 99 | Yes - $0 | $25 |
| Fidelity | The Tax Sheltered Annuity Plan of Texas Children's Hospital | 2021 | $1,706,447,554 | 15,788 | 37, 60, 64, 65, 71 | Yes - $0 | $26 |
| Fidelity | Optumcare Management, LLC 401(k) Retirement Savings Plan | 2021 | $1,341,037,601 | 10,170 | 37, 60, 64, 65, 71 | Yes - $0 | $28 |
| Fidelity | Danaher Corporation & Subsidiaries Savings Plan | 2021 | $7,166,528,576 | 41,571 | 37 64 65 71 | Yes - $0 | $33 |
| Fidelity | Fortive Retirement Savings Plan | 2021 | $1,987,784,377 | 12,758 | 37, 64, 65, 71 | No | $34 |
| **Alight** | **Equitable 401(k) Plan** | **2021** | **$2,621,769,910** | **13,510** | **15 50 59** | **Yes - $0** | **$72** |

126. The above chart demonstrates that for similar plans, regarding assets and participants, the Plan had one of the highest recordkeeping fees from 2019 through 2021.

127. As of the end of 2021 there were only 1,011 (0.2%) 401(k) plans with more than $1 billion in plan assets. *See* https://www.ici.org/system/files/2023-09/23-rpt-dcplan-profile-401k.pdf. The Plan's $61 average per participant fee from 2019 to 2021 is more than double the average fee of $27 per participant from 2019 to 2021 for the twenty (20) plans listed above.

128. This vast discrepancy between the Plan's RKA fees and comparable plans existed for all years from 2019 through 2021. Indeed, the figures in the above chart are just an example of the Plan's excessive RKA fees from 2019 through 2021.

129. The Plan should have been able to obtain per participant recordkeeping fees of no more than $27 per participant, and likely even less. This fee is consistent with the average recordkeeping fees paid by similar plans in the country as demonstrated in the allegations above.

130. Given the size of the Plan's assets and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost since the beginning of the Class Period.

## COUNT I
## Breaches of Fiduciary Duty of Prudence
### (Against Administrative Committee and Investment Committee Defendants)

131. Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

132. At all relevant times, the Administrative Committee and its members, and the Investment Committee and its members ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

133. As fiduciaries of the Plan, the Prudence Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

134. The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. Prudence Defendants did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the interest of Plan's participants. Instead, the Prudence

49

Defendants selected and retained investment options in the Plan despite poor performance in relation to other comparable investments.

135. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Prudence Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan's participants would have had more money available to them for their retirement.

136. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiff is entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

137. The Prudence Defendants knowingly participated in each breach, knowing that such acts were a breach, and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.

## COUNT II
### Failure to Adequately Monitor Other Fiduciaries
### (Asserted against the Company Defendant)

138. Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

50

139. Equitable (the "Monitoring Defendant") had the authority to appoint and remove members of the Administrative Committee and Investment Committee, and the duty to monitor the Administrative Committee and Investment Committee and were aware that the Administrative Committee and Investment Committee Defendants had critical responsibilities as fiduciaries of the Plan.

140. In light of this authority, the Monitoring Defendant had a duty to monitor the Administrative Committee and Investment Committee Defendants to ensure that the Administrative Committee and Investment Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Administrative Committee and Investment Committee Defendants were not fulfilling those duties.

141. The Monitoring Defendant also had a duty to ensure that the Administrative Committee and Investment Committee Defendants possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; and reported regularly to the Monitoring Defendant.

142. The Monitoring Defendant breached its fiduciary monitoring duties by, among other things:

    (a)    Failing to monitor and evaluate the performance of the Administrative Committee and Investment Committee Defendants or have a system in place for doing so, standing idly by as the Plan

51

suffered significant losses as a result of the Administrative Committee and Investment Committee Defendants' imprudent actions; and

(b)    failing to remove Administrative Committee and Investment Committee members whose performance was inadequate, all to the detriment of the Plan and Plan's participants' retirement savings.

143.   As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses. Had the Monitoring Defendant complied with its fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

144.   Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Administrative Committee and Investment Committee Defendants. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C.    A Declaration that the Defendants have breached their fiduciary duties under ERISA;

D.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.    An order requiring the Company to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, as necessary to effectuate said relief, and to prevent the Defendants' unjust enrichment;

F.    Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.     An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.     Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I.     An award of pre-judgment interest;

J.     An award of costs pursuant to 29 U.S.C. § 1132(g);

K.     An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.     Such other and further relief as the Court deems equitable and just.

Dated: March 31, 2025                    Respectfully submitted,

                                         */s/ Mark K. Gyandoh*
                                         Mark K. Gyandoh, Esquire
                                         New Jersey Bar No. 025622001
                                         James A. Maro, Esquire
                                         New Jersey Bar No. 017052000
                                         **CAPOZZI ADLER, P.C.**
                                         312 Old Lancaster Road
                                         Merion Station, PA 19066
                                         Email: markg@capozziadler.com
                                                jamesm@capozziadler.com
                                         Tel.: (610) 890-0200
                                         Fax: (717) 232-3080

                                         *Counsel for Plaintiff and the Putative Class*