## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| HOLLIS TEDFORD, individually and on behalf of all others similarly situated,  )  )  )  )   **Plaintiff,**  )  )  v.  )  )  EQUITABLE FINANCIAL LIFE INSURANCE COMPANY, THE BENEFITS ADMINISTRATIVE COMMITTEE FOR THE EQUITABLE 401(K) PLAN, and THE INVESTMENT COMMITTEE FOR THE EQUITABLE 401(K) PLAN,  )  )  )  )  )  )  )  )  )  )  )  **Defendants.**  )  ) | **CIVIL ACTION NO.**:  2:25-02180-JKS-AME |

## AMENDED COMPLAINT

Plaintiff, Hollis Tedford, ("Plaintiff"), by and through his attorneys, on behalf of the Equitable 401(k) Plan (f/k/a the AXA Equitable 401(k) Plan) (the "Plan"),[1] himself and all others similarly situated, states and alleges as follows:

---

[1] "Effective June 15, 2020, the Plan sponsor, AXA Equitable Life Insurance Company was legally renamed to Equitable Financial Life Insurance Company." Report of Independent Auditors ("Auditor's Report") attached to 2020 Form 5500, at 4. The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

## I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, Equitable Financial Life Insurance Company, f/k/a AXA Equitable Life Insurance Company ("Equitable" or the "Company"), the Benefits Administrative Committee for the Plan ("Administrative Committee") and the Investment Committee for the Plan (collectively, the Company, the Administrative Committee and the Investment Committee are referred to as the "Defendants") for breaches of its fiduciary duties.

2.    The Plan is a defined contribution retirement plan, established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34) of ERISA, that enables eligible participants to make tax-deferred contributions from their salaries to the Plan.

3.    To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).  These twin fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 333 (3d Cir. 2019).

4.      The Department of Labor ("DOL") has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers."[2]; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) ("*Tibble I*") (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

5.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7.

6.      "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").

7.      Because cost-conscious management is fundamental to prudence, the concept applies not only to investments, but to a fiduciary's obligation to

---

[2] *See* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Sept. 2019), at 2, available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited July 24, 2024).

continuously monitor all fees incurred by plan participants, including a plan's recordkeeping and administration fees ("RKA").

8.      Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

9.      The Supreme Court reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 741 (2022).

10.     Plaintiff alleges that during the putative Class Period, Defendants, as the "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties owed to the Plan, to Plaintiff, and to the other participants of the Plan by, *inter alia*, failing to objectively and adequately

review the Plan's investment portfolio, initially and on an ongoing basis, with due care to ensure that each investment option was prudent, in terms of performance.

11.    At all times during the Class Period, the Plan had over two billion dollars in assets under management. At the start of the Class Period in 2019, the Plan had $2,204,590,363 in assets under management. *See* 2019 Form 5500 for the Plan ("2019 Form 5500"), Schedule H at 2.

12.    By 2023, the Plan had $2,435,965,841 in assets under management. *See* 2023 Form 5500 for the Plan ("2023 Form 5500"), Schedule H at 2.

13.    The Plan's assets under management qualifies it as a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States.  In 2021, only 0.2 percent (1,011 of 641,747) of plans in the country had more than $1 billion in assets under management.[3] In addition, this was true at the start of the Class Period in 2019 where only 0.1 percent (776 of 603,217) of 401(k) plans in the country were as large as the Plan.[4]

---

[3] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at Plans, 2021 at Ex. 1.2, p. 7., available at https://www.ici.org/system/files/2024-08/24-ppr-dcplan-profile-401k.pdf.

[4] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2019 at Ex. 1.2, p. 7, available at https://www.ici.org/system/files/2022-09/22-ppr-dcplan-profile-401k.pdf.

14. As a jumbo plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.

15. The Plan is also large in terms of the number of its participants. From 2019 to 2023 it had over 12,000 participants with account balances, with a high of 15,877 participants in 2020. *See* 2020 Form 5500 at 2. In 2021, only 0.1 percent (844 of 641,747) of 401(k) plans in the country were as large as the Plan.[5]

16. For comparison, according to information derived from ERISApedia.com's database, a service that compiles all Form 5500s filed with the Dept. of Labor ("DOL") by retirement plans, in 2020, there were only 198 defined contribution plans (401k, 401a, and 403b) in the country with between 15,000 and 19,999 participants.

17. The marketplace for retirement plan services is established and competitive. Accordingly, as a jumbo plan, in addition to the large number of participants, the Plan had substantial bargaining power to obtain high-quality, low-cost RKA services. The Plan's fiduciaries, however, did not try to reduce the Plan's expenses to ensure they were prudent until it was too late. Rather, the Plan's

---

[5] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at Plans, 2021 at Ex. 1.2, p. 7., available at https://www.idc.org/system/files/2024-08/24-ppr-dcplan-profile-401k.pdf.

fiduciaries allowed unreasonable expenses to be charged to participants for RKA services from 2019 through 2021.

18.   Defendants caused the Plan to enter into an arrangement with Alight Financial Solutions, LLC ("Alight"), a party in interest, under which Alight received millions of dollars in exchange for recordkeeping services rendered to the Plan. Alight was also receiving millions of dollars in indirect compensation from investments within the Plan. This arrangement with Alight is a prohibited transaction because it "amounts to a 'direct or indirect ... furnishing of services ... between the plan and a party in interest,' 29 U.S.C. § 1106(a)(1)(C)." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 601 (8th Cir. 2009).

19.   With regard to the Plan's investments, Defendants breached their fiduciary duty of prudence by selecting and/or maintaining certain guaranteed investment contracts ("GICs") in the Plan with lower crediting rates when compared to available similar or identical investments with higher crediting rates. The crediting rate is the guaranteed rate of return for the investment fund.

20.   Specifically, Defendants allowed substantial assets in the Plan to be invested in the Equitable Fixed Income Fund ("Equitable Fund") that invested in synthetic GICs offered by JPMorgan Chase Bank, N.A., State Street Bank & Trust, Prudential Insurance Company of America, American General Life Insurance Company, Nationwide Life Insurance Company, Transamerica Premier Life

Insurance Company, Lincoln National Life Insurance Company, Pacific Life Insurance Company, Metropolitan Tower Life Insurance Company, and Massachusetts Mutual Life Insurance Company,[6] (the "Insurance Companies"), that provided significantly lower rates of return than comparable stable value funds that Defendants could have made available to Plan participants.

21.    A prudent fiduciary would not have included this underperforming investment option that also carried significantly more risk than other investment options that had similar goals, *i.e.,* preservation of investment assets.

22.    The Insurance Companies benefited significantly from participants in the Plan investing in the Equitable Fund. A prudent fiduciary who adequately monitored the Plan's investments and placed the interests of participants in the Plan above all would have recognized that the Equitable Fund was benefiting the Insurance Companies at the expense of Plan participants.

23.    During the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties owed to the Plan, to Plaintiff, and to the other participants of the Plan by, *inter alia*: (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was

---

[6] The Massachusetts Mutual Life Insurance Company GIC was an underlying asset in the Equitable Fund in 2022 and 2023 only.

8

prudent, in terms of cost and performance; (2) failing to control the Plan's RKA services costs; and (3) engaging in prohibited transactions in violation of 29 U.S.C. § 1106 (a)(1)(C).

24. Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

25. Based on this conduct, Plaintiff asserts claims against Defendants for breach of the fiduciary duty of prudence (Count I), failure to monitor fiduciaries (Count II), and violation of ERISA's prohibited transactions (Count III).

## II.    JURISDICTION AND VENUE

26. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

27. This Court has personal jurisdiction over Defendants because the Plan is/was administered in this District meaning Equitable transacts business in this District, resides in this District, and/or has significant contacts with this District, and because ERISA provides for nationwide service of process.

9

28.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Equitable does business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.   PARTIES

### Plaintiff

29.     Plaintiff, Hollis Tedford ("Tedford"), resides in Falmouth, Maine. During his employment, Plaintiff Tedford participated in the Plan. Tedford invested in the Equitable Fund in the Plan and suffered injury to his Plan account due to the significant underperformance of the Equitable Fund. In addition, Plaintiff Tedford also suffered injury to his Plan account by overpaying for his share of RKA costs.

30.     Plaintiff has standing to bring this action on behalf of the Plan because he participated in the Plan and was injured by Defendants' unlawful conduct. Plaintiff is entitled to receive benefits in the amount of the difference between the value of his account currently, or as of the time his account was distributed, and what his account is or would have been worth, but for Defendants' breaches of fiduciary duties as described herein.

31.    Plaintiff did not have knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

***Company Defendant***

32.    Equitable is the sponsor of the Plan and a named fiduciary of the Plan with a principal place of business at 100 Madison Street, Syracuse, New York. *See* 2023 Form 5500, at 1, filed with the United States Department of Labor. At the start of the Class Period and until at least 2021, the Company's address was 525 Washington Boulevard, Jersey City, New Jersey. *See* 2021 Form 5500, at 1. Equitable is a financial services and insurance company.

33.    The Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A). Through an employee who holds the title Chief Human Resource Officer, the Company appointed the members of the Administrative Committee and the Investment Committee to serve as named fiduciaries of the Plan. *See* Auditor's Report attached to 2023 Form 5500, at 5 ("The Chief Human Resource Officer is permitted to appoint Committee members to be responsible for reviewing investment guidelines, monitoring asset managers, selecting asset allocations and investment options for the Plan, and delegating such responsibility as deemed appropriate."). Under ERISA, fiduciaries with the power

11

to appoint have a concomitant fiduciary duty to monitor and supervise their appointees.

34.     Further, at all times, Equitable acted through its officers to perform Plan-related fiduciary functions. These officers were acting in the course and scope of their employment.

35.     Accordingly, Equitable during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Benefits Executive.

### *The Administrative Committee*

36.     The Administrative Committee serves as a plan administrator. *See* 2023 Form 5500, at 2; *see also* Auditor's Report attached to 2023 Form 5500, at 5 ("The named fiduciar[y] of the Plan [is] the Administrative Committee . . . . The Administrative Committee serves as the Plan administrator.")

37.     Each member of the Administrative Committee during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period, because each had control over Plan management and/or authority or control over management or disposition of Plan assets.

38.     Members of the Administrative Committee during the Class Period are collectively referred to herein as the "Administrative Committee Defendants."

### *The Investment Committee*

39.    The Investment Committee served as named fiduciary. *See* Auditor's Report attached to 2023 Form 5500, at 5 ("The named fiduciar[y] of the Plan [is] . . . the Investment Committee Investment Committee.

40.    "The Plan's Investment Committee determines the Plan's valuation policies and procedures utilizing information provided by its investment advisors and trustees." Auditor's Report attached to 2023 Form 5500, at 8.

41.    The Investment Committee exercised discretionary control over the management and disposition of the Plan's assets.

42.    The Investment Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because each exercised discretionary authority over management or disposition of Plan assets.

43.    The Investment Committee and members of the Investment Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Investment Committee Defendants."

44.    Collectively, the Administrative Committee and the Investment Committee are referred to as the "Committees."

13

## IV.    CLASS ACTION ALLEGATIONS[7]

45.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and the following proposed class ("Class"):

> All persons, except Defendants and any fiduciary of the Plan and their immediate family members, who were participants in or beneficiaries of the Equitable 401(k) Plan (f/k/a the AXA Equitable 401(k) Plan) at any time between March 31, 2019 to the date of judgment (the "Class Period").[8]

46.    The members of the Class are so numerous that joinder of all members is impractical. The 2023 Form 5500 lists 12,916 Plan "participants with account balances as of the end of the plan year." 2023 Form 5500, at 2.

47.    Plaintiff's claims are typical of the claims of the members of the Class. Like other Class members, Plaintiff participated in the Plan and has suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiff

---

[7] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiff to prosecute claims on behalf of the Plan and all participants. *See, e.g.*, *In re: Wilmington Trust Corp.*, 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims). ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

[8] Plaintiff reserves his right to seek modification of the close of the Class Period in the event that further investigation/discovery reveals a more appropriate end period.

14

consistently with other Class members, and managed the Plan as a single entity. Plaintiff's claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

48.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A.      Whether Defendants are a fiduciary of the Plan;

B.      Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

C.      The proper form of equitable and injunctive relief; and

D.      The proper measure of monetary relief.

49.     Plaintiff will fairly and adequately represent the Class, and has retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiff has no interests antagonistic to those of other members of the Class. Plaintiff is committed to the vigorous prosecution of this action, and anticipates no difficulty in the management of this litigation as a class action.

50.     This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing

15

incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

51.    In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.    THE PLAN

52.    "The Plan is a defined contribution plan with a cash or deferred arrangement providing benefits for eligible common-law employees and statutory employees of Equitable and certain participating affiliates." Auditor's Report attached to 2023 Form 5500, at 5.

53.    "The Plan covers full-time employees, "Group I" part-time employees, financed financial professionals, and statutory employees, as well as other employees of Equitable and employees of certain participating affiliates who are scheduled to work a minimum of 1,000 hours in a Plan year." *Id*.

54.    "Eligible new hires are automatically enrolled in the Plan after performing one hour of service." *Id*.

55.    "The Plan allows participants to invest in the Equitable Fixed Income Fund (the "Fund"), which is a separately managed account consisting of synthetic Guaranteed Investment Contracts ("GICs")." *Id*., at 11.

56.    At the end of 2019, $461,965,621 in Plan assets were invested in the Equitable Fund. *See* Auditor's Report attached to 2019 Form 5500, at 13.

57.    In 2019, the Equitable Fund consisted of nine GICs (JPMorgan, State Street, Prudential, American General, Nationwide, Transamerica, Lincoln National, Pacific Life, and Metropolitan Tower). *See id*.

58.    By the end of 2023, over $373 million in Plan assets were invested in the synthetic CIGs in the Equitable Fund. *See* Auditor's Report attached to 2023 Form 5500, at 13.

59.    The chart below demonstrates the amount of Plan assets invested in the Equitable Fund during the Class Period.

| Plan Year | Plan Assets in the Equitable Fund |
|---|---|
| 2019 | $461,965,621 |
| 2020 | $504,921,405 |
| 2021 | $473,261,647 |
| 2022 | $442.955,913 |
| 2023 | $373,592,465 |

17

## VI.  THE TOTALITY OF THE CIRCUMSTANCES DEMONSTRATES THAT DEFENDANTS FAILED TO ADMINISTER THE PLAN IN A PRUDENT MANNER

### A.  ERISA Fiduciaries Are Held to the Highest Standards Regarding Process and Methodology of Evaluating Investments

60. As described in the "Parties" section above, Defendants are/were fiduciaries of the Plan.

61. ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exist "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 142 S. Ct. at 741.

62. As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. ..." DOL 408(b)(2) Regulation Fact Sheet.

18

63.    The duty "…to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[9]

64.    Acting in the sole interest of plan participants is all encompassing. A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. *See* the U.S. Department of Labor, Employee Benefits Security Administration (EBSA)'s "Meeting Your Fiduciary Responsibilities," at 2 ("The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. It requires expertise in a variety of areas, such as investments."), available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

65.    A prudent investment professional, and hence a fiduciary, must regularly evaluate a fund's performance history, the portfolio manager's experience and tenure, changes to the fund's investment strategy, changes to the underlying assets in the investment, total assets under management within the fund, fees, and other relevant factors.

---

[9] Available at
https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain.

19

66.    With respect to investment returns, diligent investment professionals monitor the performance of their selected investments using appropriate industry-recognized "benchmarks" and prudently managed equivalents.

67.    The measurement of investments against prudently managed alternatives is critical given that these alternatives represent other investments available to a plan, which may increase the likelihood that participants reach/live their preferred lifestyle in retirement.

68.    Whether a plan fiduciary enlists the assistance of an investment manager, consultant, or advisor, the plan's fiduciaries are not relieved of fiduciary liability for selecting and monitoring the plan's investment options.

69.    It is black letter law that a fiduciary's duty to conduct an "independent investigation into the merits of a particular investment," is the "most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Circ. 1996). *Hughes*, 142 S. Ct. at 738 (noting ERISA fiduciaries are required to "conduct their own independent evaluation to determine which investments may by prudently included in the plan's menu of options.").

70.    To the extent plan fiduciaries have adopted an investment policy statement, those fiduciaries "must comply with the plan's written statements of investment policy, insofar as those written statements are consistent with the provisions of ERISA." *Lauderdale v. NFP Retirement, Inc.*, 2022 WL 17260510, at

20

* 10 (S.D. Cal. Nov. 17, 2022). That is, the investment policy statement must be written with the sole interest of the plan participant in mind.

71.    Plaintiff did not have and does not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing the Plan's investments because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

72.    Among other things, Plaintiff does not have access to any meeting minutes of the Committees to the extent they exist. Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. But in most cases, even that is not sufficient. For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence. Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits

21

of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

73.     For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these processes and methods based upon several factors as described below.

74.     Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the selection (and maintenance) of the Equitable Fund in the Plan throughout the Class Period that wasted the assets of the Plan and the assets of participants because of unnecessary costs and underperformance.

**B.     Defendants Breached Their Fiduciary Duties by Causing the Plan to Offer the Equitable Fund**

**1.     Overview of GICs**

75.     For defined-contribution retirement plans, stable value investments are intended to provide participants with an option that protects their assets and is shielded from risks of loss, hence why they are called Guaranteed Investment Contracts or GICs.

76.     GICs are issued by insurance companies in the form of a fixed annuity contract. Pursuant to the terms of those contracts, the GICs provide for a guaranteed rate of return or "crediting rate" during a specified period.

77. There are several different types of stable value investments in the retirement plan marketplace that largely fulfil the same purpose, income preservation. Large plans often offer "synthetic" stable value funds where the principal is guaranteed by multiple "wrap providers" and the fund owns the assets of the underlying funds.

78. In separate account products, the assets of the underlying funds are held in the separate account of an insurance carrier and there is only one "wrap" provider. For separate account GICs, the insurer's payment obligations are putatively backed by a separate account, which is less susceptible to claims and liabilities against the insurer.

79. In general account products, funds are held unrestricted in the general account of the insurance carrier.

80. Notwithstanding the different labels of the GICs, their goal remains identical to all income preservation funds. Accordingly, plan fiduciaries should select stable value funds based on crediting rates that are in the best interests of participants.

### 2. The Plan's Inclusion of Equitable Fund

81. At all relevant times, Defendants maintained the authority to exercise control over the Plan's investments, including the Plan's Equitable Fund.

82. The Insurance Companies establish the crediting rates for their underlying GICs in the Equitable Fund in the Plan.

### 3. There are Many GICs in the Marketplace with Competitive Crediting Rates

83. The marketplace for GICs is robust with many insurance companies offering GICs with competitive rates.

84. Throughout the Class Period, identical or substantially identical stable value funds with higher crediting rates, and hence more beneficial to Plan participants, were available to the Plan, but were not selected by Defendants.

85. The Equitable Fund in the Plan had underwhelming crediting rates when compared against stable value GICs provided by the same or other comparable carriers for other retirement plans:

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate[10] |
|---|---|---|---|---|---|
| 2019 | Baylor College of Medicine Retirement Plan | 12,587 | $1,278,730,175 | Lincoln Financial Group | 4.29% |

---

[10] For crediting rates not identified in the plans' Form 5500s, the calculated yield is interest credited divided by the end of year balance.

24

| | | | | |
|---|---|---|---|---|
| | Jackson National Life Insurance Company Defined Contribution Plan | 5,002 | $1,090,110,381 | Jackson National Life Insurance | 4.28% |
| | Holzer Health System 401(a) Profit Sharing Plan | 1,896 | $179,609,420 | American United Life Insurance Company | 3.98% |
| | Transamerica 401(k) Retirement Savings Plan | 15,140 | $2,020,965,905 | Transamerica Financial Life Insurance Company | 3.85% |
| | American United Life Progress Sharing Plan and Trust | 3,051 | $377,919,056 | American United Life Insurance Company | 3.70% |
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,515 | $355,957,124 | Massachusetts Mutual Life Insurance Company | 3.56% |
| | **AXA Equitable 401(k) Plan** | **15,639** | **$2,204,590,363** | **The Prudential Insurance Company of America** | **3.18%** |
| | | | | **American General Life Insurance Company** | **2.78%** |
| | | | | **Nationwide Life Insurance Company** | **2.77%** |

| Year | Plan | Participants | Amount | Company | Percentage |
|---|---|---|---|---|---|
| | | | | JPMorgan Chase Bank, N.A. | 2.76% |
| | | | | Transamerica Premier Life Insurance Company | 2.76% |
| | | | | State Street Bank & Trust | 2.75% |
| | | | | Lincoln National Life Insurance Company | 2.75% |
| | | | | Pacific Life | 2.26% |
| | | | | Metropolitan Tower Life Insurance Company | 0.40% |
| | | | | | |
| 2020 | Baylor College of Medicine Retirement Plan | 12,905 | $1,493,377,139 | Lincoln Financial Group | 4.16% |
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,711 | $428,308,461 | Massachusetts Mutual Life Insurance Company | 3.56% |
| | American United Life Progress Sharing Plan and Trust | 2,699 | $435,970,029 | American United Life Insurance Company | 3.54% |
| | Equitable 401(k) Plan | 15,877 | $2,374,376,828 | The Prudential Insurance Company of America | 2.52% |
| | | | | American General Life Insurance Company | 2.12% |

26

| | | | | Nationwide Life Insurance Company | 2.38% |
|---|---|---|---|---|---|
| | | | | JPMorgan Chase Bank, N.A. | 2.52% |
| | | | | Transamerica Premier Life Insurance Company | 2.31% |
| | | | | State Street Bank & Trust | 2.39% |
| | | | | Lincoln National Life Insurance Company | 2.01% |
| | | | | Pacific Life | 2.02% |
| | | | | Metropolitan Tower Life Insurance Company | 1.82% |
| | | | | | |
| 2021 | Gemba Group Annuity Plan | 969 | $118,565,852 | National Ohio Financial Services | 4.97% |
| | Baylor College of Medicine Retirement Plan | 13,391 | $1,692,013,731 | Lincoln Financial Group | 4.23% |
| | Holzer Health System 401(a) Profit Sharing Plan | 2,017 | $203,815,263 | American United Life Insurance Company | 4.02% |
| | American United Life Progress Sharing Plan and Trust | 3,183 | $493,267,284 | American United Life Insurance Company | 3.87% |

| | | | | | |
|---|---|---|---|---|---|
| | Gemba Group Annuity Plan | 969 | $118,565,852 | Principal Life Insurance Company | 3.84% |
| | **Equitable 401(k) Plan** | **13,510** | **$2,621,769,910** | **The Prudential Insurance Company of America** | **1.86%** |
| | | | | **American General Life Insurance Company** | **1.86%** |
| | | | | **Nationwide Life Insurance Company** | **1.86%** |
| | | | | **JPMorgan Chase Bank, N.A.** | **1.86%** |
| | | | | **Transamerica Premier Life Insurance Company** | **1.86%** |
| | | | | **State Street Bank & Trust** | **1.86%** |
| | | | | **Lincoln National Life Insurance Company** | **1.86%** |
| | | | | **Pacific Life** | **1.70%** |
| | | | | **Metropolitan Tower Life Insurance Company** | **1.63%** |
| 2022 | International Imaging Materials Inc. Retirement and Investment Plan | 445 | $59,443,888 | Lincoln National Life Insurance Co. | 4.89% |

| | | | | |
|---|---|---|---|---|
| Baylor College of Medicine Retirement Plan | 14,036 | $1,434,738,254 | Lincoln Financial Group | 4.37% |
| American United Life Progress Sharing Plan and Trust | 3,235 | $439,262,320 | American United Life Insurance Company | 3.90% |
| Jackson National Life Insurance Company Defined Contribution Plan | 4,650 | $1,149,061,601 | Jackson National Life Insurance | 3.83% |
| Alina 401(k) Retirement Savings Plan | 34,554 | $2,678,277,538 | Brighthouse Life Insurance Company | 3.69% |
| Trugreen Profit Sharing and Retirement Plan | 11,408 | $371,495,784 | Massachusetts Mutual Life Insurance Company | 3.67% |
| **Equitable 401(k) Plan** | **13,104** | **$2,174,972,449** | **State Street Bank & Trust** | **2.85%** |
| | | | **American General Life Insurance Company** | **1.88%** |
| | | | **The Prudential Insurance Company of America** | **1.88%** |
| | | | **Pacific Life** | **1.88%** |

29

| | | | | JPMorgan Chase Bank, N.A. | 1.88% |
|---|---|---|---|---|---|
| | | | | Metropolitan Tower Life Insurance Company | 1.88% |
| | | | | Nationwide Life Insurance Company | 1.68% |
| | | | | Lincoln National Life Insurance Company | 1.49% |
| | | | | Massachusetts Mutual Life Insurance Company | 1.43% |
| | | | | Transamerica Life Insurance Company | 0.33% |
| | | | | | |
| 2023 | Valley Hospital Retirement Defined Contribution Plan | 4,282 | $550,230,744 | Lincoln National Life Insurance Co. | 4.57% |
| | Mattel, Inc. Personal Investment Plan | 7,427 | $1,167,576,000 | Metropolitan Tower Life Insurance Co. | 3.71% |
| | Pomona Valley Hospital Medical Center Retirement Savings Plan | 4,219 | $525,201,271 | Lincoln National Life Insurance Co. | 3.64% |

| | | | | |
|---|---|---|---|---|
| | Auto-Owners Insurance Company Retirement Savings Plan | 8,582 | $772,874,102 | Auto-Owners Life Insurance Company | 3.48% |
| | | | | Lincoln National Life Insurance Company | 2.28% |
| | | | | The Prudential Insurance Company of America | 2.28% |
| | | | | Metropolitan Tower Life Insurance Company | 2.28% |
| | | | | Pacific Life | 2.28% |
| | Equitable 401(k) Plan | 12,916 | $2,435,965,841 | Nationwide Life Insurance Company | 2.45% |
| | | | | State Street Bank & Trust | 2.28% |
| | | | | JPMorgan Chase Bank, N.A. | 2.28% |
| | | | | American General Life Insurance Company | 2.28% |
| | | | | Massachusetts Mutual Life Insurance Company | 2.29% |
| | | | | Transamerica Life Insurance Company | 2.28% |

86.    Throughout the Class Period, the Equitable Fund underperformed the comparator funds by an average of almost 48% as demonstrated in the table below.

31

| Year | Equitable Fund Average Rate of Return | Comparator Average Rate of Return | Equitable Fund Percentage of Underperformance |
|---|---|---|---|
| 2019 | 2.40% | 3.94% | 39.09% |
| 2020 | 2.20% | 3.75% | 41.33% |
| 2021 | 1.67% | 4.19% | 60.14% |
| 2022 | 1.59% | 4.06% | 60.84% |
| 2023 | 2.37% | 3.85% | 38.44% |
| **Average Underperformance during Class Period** | | | **47.97%** |

87.    Notably, the Equitable Fund's credit rate *decreased* in 2021 at the same time the comparator rates *increased,* with the Equitable Fund's subsequent increases in crediting rates being insufficient in light of the marketplace's potential. Had Defendants prudently investigated the marketplace and prevailing circumstances they would have discovered the Equitable Fund's credit rates were far below rates that were easily achievable.

88.    In short, because the Plan held over $2 billion in assets under management at the start of the Class Period, it had considerable leverage to bargain for higher crediting rates.

89.    A prudent fiduciary would have known that other providers of fixed annuities offer substantially identical, better-performing stable value investments. A prudent fiduciary could have accomplished this goal by demanding higher crediting rates from the Insurance Companies and/or by submitting requests for proposals to the Insurance Companies and other providers of stable value investments.

90.    By selecting the Equitable Fund with underperforming crediting rates, Defendants failed to provide participants with an option that maximized the value of their investments.

91.    With the massive amount of assets under management in the Equitable Fund, the losses suffered by Plan participants were devastating.  Every additional expense imposed upon the participants compounds and reduces the value of their retirement savings over time. *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015). For example, a 1% higher fee over 35 years makes a 28% difference in retirement assets at the end of a participant's career.[11]

**C.    Defendants Committed a Prohibited Transaction Resulting in Excessive RKA costs for the Plan and its Participants**

92.    During the Class Period, Defendants entered into a contract with Alight to provide RKA services to the Plan. However, such an engagement is a prohibited transaction under ERISA.

93.    29 U.S.C. §§ 1106(a)(1)(C) provides that "(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect … (C) furnishing of goods, services, or facilities between the plan and a party in interest."

---

[11] Look at 401(k) Plan Fees, UNITED STATES DEPT. OF LABOR at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource center/publications/401k-plan-fees.pdf (accessed Feb. 14, 2025).

94. Here, Alight was a party in interest to the Plan as it was receiving compensation for RKA services, as well as indirect compensation from the Plan in the form of revenue share being paid to Alight from funds in the Plan.

**1. Costs for Recordkeeping Services Vary Little Between Competing Providers for a Plan with a Substantial Number of Participants**

95. The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Recordkeeping and administrative services fees are one and the same and the terms are used synonymously herein and referred to as RKA.

96. There are two types of essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan). First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

A. Basic account recordkeeping (e.g. demographic, source, investment and vesting records);

B. Multi-channel participant and plan sponsor access (e.g. phone, web);

C.  Daily participant transaction accounting (e.g., purchases, redemptions, exchanges);

D.  Payroll service (e.g. hardships, in-service withdrawals, termination distributions);

E.  Participant tax reporting services (e.g., IRS Form 1099-R);

F.  Participant confirmations, statements, and standard notices;

G.  Plan-level reporting and annual financial package (excluding IRS Form 5500);

H.  Participant education (e.g. newsletters, web articles, standard communication materials);

I.  Plan consulting (e.g., preapproved document services, operational materials);

J.  Plan consulting (e.g. preapproved document services, operational compliance support).

97.  This suite of essential recordkeeping services can be referred to as "Bundled" services. These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the

35

plan. As explained in more detail below, the services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.

98.     The second type of essential recordkeeping services, hereafter referred to as "A La Carte" services, provided by all national recordkeepers, often has separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants. These fees are distinct from the bundled arrangement described above to ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance. These A La Carte services typically include, but are not limited to, the following:

    a.    Loan processing;

    b.    Brokerage services/account maintenance (if offered by the plan);

    c.    Distribution services; and

    d.    Processing of qualified domestic relations orders.

99.     All national recordkeepers have the capability to provide all of the aforementioned recordkeeping services at very little cost to all large defined contribution plans, including those much smaller than the Plan. In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers.

100.    The cost of providing recordkeeping services depends in large part on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. *See* 1998 DOL Study,[12] at 4.2.2. ("Basic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases."). When more participants in a plan are on a recordkeeping platform, the recordkeeper allocates its fixed costs over a larger participant base, which reduces the per-participant cost. As a result, the cost to add a new participant to a plan is relatively low. And as the overall number of participants increases, the average cost per participant decreases. ***Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.***[13]

101.    In general, the level, number and character of participant services provided by the recordkeeper have minimal impact upon the costs of providing

---

[12] https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf ("1998 DOL Study").

[13] "[T]he actual cost of administrative services is more dependent on the number of participants in the plan." There is no "logical or practical correlation between an increase in administrative fees and an increase in plan assets." Hewitt Associates, LLC, *Be a Responsible Fiduciary: Ask the Right Questions About 401(k) Plan Fees*, Oct. 2008; *see also* Mercer Investment Consulting, Inc., *DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance* (2013), https://www.mercer.com/content/dam/mercer/.

recordkeeping. That is because building and maintaining a robust, intuitive, web-based participant interactive 401(k) account system incurs large fixed costs. Each additional participant placed on the system causes a minimal incremental/marginal cost to the record keeper *notwithstanding the level, number and character of the services provided to that additional participant.*

102.    Recordkeepers for large 401(k) plans such as Fidelity, Vanguard, Empower, Alight, and Voya, among others, invest in technology infrastructure necessary to provide recordkeeping and transaction services to all clients (*e.g.*, website, call center, and some print services).

103.    Accordingly, a plan sponsor or fiduciary has the leverage to negotiate favorable rates given that costs of implementation do not change for the service provider.

### 2.    The Plan's Recordkeeping Fees were Excessive

104.    Because recordkeeping costs are not affected by account size, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees as a fixed dollar amount rather than as a percentage of assets. *See* Mercer Best Practices at 3. Otherwise, as plan assets grow, the recordkeeping compensation increases without any change in the recordkeeping services, leading to unreasonable fees.

105.    As demonstrated in the charts below, the Plan's participants were saddled with above-market administrative and recordkeeping fees since well before the start of the Class Period and up to at least 2021.[14]

106.    The Plan's per participant RKA fees were as follows:

| Plan Year | Recordkeeper | Participants | Total RKA Reported[15] | PP$ |
|---|---|---|---|---|
| 2021 | Alight | 13,510 | $970,892 | $71.86 |
| 2020 | Alight | 15,877 | $736,723 | $46.40 |
| 2019 | Alight | 15,639 | $1,018,118 | $65.10 |
| 2018 | Alight | 15,445 | $1,025,333 | $66.39 |
| 2017 | Hewitt Associates, LLC[16] | 15,410 | $1,167,675 | $75.77 |

[14]  Upon information and belief, beginning in 2022 the "Administrative fees," described *infra* in n. 15, was $39 annually per participant. However, this amount does not account for other asset-based charges related to RKA. *See id.* Even looking solely at the "Administrative fees" reported in the Plan disclosures, they were still higher than all the comparator plans listed in paragraph 106 below.

[15] The amount reported in the Auditor's Reports attached to the Plan's Form 5500s. Between 2019 and 2021 Alight charged Plan participants $50 annually for "Administrative fees" which are described as "fees charged directly to your account for administrative expenses of the Plan such as recordkeeping, accounting and auditing expenses." *See, e.g.,* March 4, 2020 fee disclosure. However, Alight also received other fees labeled "asset-based fees" that were "charged as a percent of holdings in an investment and may be used to pay for investment management, administrative and revenue-sharing fees as well as other expenses relating to the maintenance of the Plan's investment options." *Id.* Plaintiffs allege these additional fees fall under the umbrella of RKA services and are of the type typically performed by recordkeepers.

[16] "The benefits outsourcing unit formerly part of insurance broker Aon Plc and sold to Blackstone Group LP in February has officially re-launched as Alight." *See* "Alight, formerly part of Aon Hewitt, seeks to expand its cloud services portfolio" June 7, 2017.

| 2016 | Hewitt Associates, LLC | 15,197 | $957,353 | $63.00 |
| 2015 | Hewitt Associates, LLC | 14,103 | $981,170 | $69.57 |
| 2014 | Hewitt Associates, LLC | 14,060 | $1,054,249 | $74.98 |
| 2013 | Hewitt Associates, LLC | 14,022 | $1,263,420 | $90.10 |
| 2012 | Hewitt Associates, LLC | 15,075 | $1,252,739 | $83.10 |

107. Looking at recordkeeping costs for plans similar in size to the combined assets and participant size of the Plan from 2019 through at least 2021 shows that the Plan was paying higher recordkeeping fees than its peers.

| Recordkeeper | Plan Name | Plan Year | Assets Under Management | Participants | Schedule C Codes | Indirect Compensation | Cost Per Participant[17] |
|---|---|---|---|---|---|---|---|
| T. Rowe Price | Thermo Fisher Scientific Inc. 401(k) Retirement Plan | 2019 | $5,675,354,000 | 42,339 | 15 21 25 28 33 37 38 49 50 52 55 59 62 64 65 | Yes - $0 | $9 |
| Great-West Life | Deseret 401(k) Plan | 2019 | $4,264,113,298 | 34,938 | 64 | Yes - $0 | $22 |
| Fidelity | The Dow Chemical Company Employees' Savings Plan | 2019 | $10,913,979,302 | 37,868 | 37 50 64 60 65 | Yes - $0 | $25 |
| Vanguard/ Prudential | Philips North America 401(k) Plan | 2019 | $4,898,009,752 | 28,428 | 15 37 50 65 99 | Yes - $0 | $25 |
| Fidelity | Danaher Corporation & Subsidiaries Savings Plan | 2019 | $5,228,805,794 | 33,116 | 37 64 65 71 | Yes - $0 | $34 |
| Fidelity | First American Financial Corporation 401(k) Savings Plan | 2019 | $1,791,281,396 | 15,246 | 37, 60, 64, 65, 71 | Yes - $0 | $35 |

---

[17] These fees are taken from the Form 5500 and include all compensation reported to be paid to Alight.

40

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Great-West Life/ TIAA | Penn State Health 401(k) Savings Plan | 2019 | $1,646,231,456 | 15,020 | 64 | Yes - $0 | $35 |
| **Alight** | **AXA Equitable 401(k) Plan** | **2019** | **$2,204,590,363** | **15,639** | **15 50 59** | **Yes - $0** | **$65** |
| ███████ | ███████ | ███ | ███████ | ███ | ███ | ███ | ███ |
| Vanguard | FedEx Office and Print Services, Inc. 401(k) Retirement Savings Plan | 2020 | $1,051,387,744 | 19,354 | 15, 25, 50, 16, 26, 52, 21, 37, 57 | Yes - $0 | $23 |
| T. Rowe Price | Thermo Fisher Scientific Inc. 401(k) Retirement Plan | 2020 | $6,618,601,000 | 43,691 | 15 21 25 28 37 38 49 50 52 59 62 64 65 99 | Yes - $0 | $25 |
| Prudential | Philips North America 401(k) Plan | 2020 | $5,663,746,665 | 28,348 | 15 37 50 65 99 | Yes - $0 | $25 |
| Fidelity | Sutter Health 403(b) Savings Plan | 2020 | $5,564,538,096 | 67,149 | 37 60 64 65 | Yes - $0 | $26 |
| Fidelity | Danaher Corporation & Subsidiaries Savings Plan | 2020 | $6,148,370,238 | 35,467 | 37 64 65 71 | Yes - $0 | $30 |
| Vanguard | Kaiser Permanente Supplemental Savings and Retirement Plan | 2020 | $4,523,681,952 | 48,263 | 15 25 26 37 38 53 | Yes - $0 | $38 |
| **Alight** | **Equitable 401(k) Plan** | **2020** | **$2,374,376,828** | **15,877** | **15 50 59** | **Yes - $0** | **$46** |
| ███████ | ███████ | ███ | ███████ | ███ | ███ | ███ | ███ |
| T. Rowe Price | Thermo Fisher Scientific Inc. 401(k) Retirement Plan | 2021 | $7,716,713,000 | 51,325 | 15 21 25 28 33 37 38 49 50 52 55 59 62 64 65 | Yes - $0 | $13 |
| Fidelity | Sutter Health 403(b) Savings Plan | 2021 | $6,372,464,202 | 66,814 | 37 60 64 65 71 | Yes - $0 | $25 |
| Prudential | Philips North America 401(k) Plan | 2021 | $6,384,324,582 | 30,245 | 15 37 50 65 99 | Yes - $0 | $25 |
| Fidelity | The Tax Sheltered Annuity Plan of Texas Children's Hospital | 2021 | $1,706,447,554 | 15,788 | 37, 60, 64, 65, 71 | Yes - $0 | $26 |
| Fidelity | Optumcare Management, LLC 401(k) Retirement Savings Plan | 2021 | $1,341,037,601 | 10,170 | 37, 60, 64, 65, 71 | Yes - $0 | $28 |
| Fidelity | Danaher Corporation & | 2021 | $7,166,528,576 | 41,571 | 37 64 65 71 | Yes - $0 | $33 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Subsidiaries Savings Plan | | | | | | |
| Fidelity | Fortive Retirement Savings Plan | 2021 | $1,987,784,377 | 12,758 | 37, 64, 65, 71 | No | $34 |
| **Alight** | **Equitable 401(k) Plan** | **2021** | **$2,621,769,910** | **13,510** | **15 50 59** | **Yes - $0** | **$72** |

108. The above chart demonstrates that for similar plans, regarding assets and participants, the Plan had one of the highest recordkeeping fees from at least 2019 through 2021. This trend has likely continued to the present given that RKA fees for plans have generally decreased over the past few years.

109. As of the end of 2021 there were only 1,011 (0.2%) 401(k) plans with more than $1 billion in plan assets. *See* https://www.ici.org/system/files/2023-09/23-rpt-dcplan-profile-401k.pdf. The Plan's $61 average per participant fee from 2019 to 2021 is more than double the average fee of $27 per participant from 2019 to 2021 for the twenty (20) plans listed above.

110. This vast discrepancy between the Plan's RKA fees and comparable plans existed for all years from 2019 through 2021. Indeed, the figures in the above chart are just an example of the Plan's excessive RKA fees from 2019 through 2021. Plaintiffs' allegations are that the Plan's RKA fees have been excessive throughout the Class Period which extends to the date of judgment.

111. The Plan should have been able to obtain per participant recordkeeping fees of **no more than $27 per participant**, and likely even less. This fee is consistent with the average recordkeeping fees paid by similar plans in the country

42

as demonstrated in the allegations above.  To the extent the Plan paid more than $27 per participant at any point during the Class Period, Plaintiffs allege this amount was excessive.

112.  Further, because Alight was a party-in-interest and received income from funds maintained in the Plan, the Plan's fiduciaries should have taken these additional sources of income into consideration to reduce the excessive RKA fees paid to Alight.

113.  Given the size of the Plan's assets and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost since the beginning of the Class Period.

## COUNT I
### Breaches of Fiduciary Duty of Prudence
### (Against Administrative Committee and Investment Committee Defendants)

114.  Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

115.  At all relevant times, the Administrative Committee and its members, and the Investment Committee and its members ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. §

43

1002(21)(A), in that it exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

116. As fiduciaries of the Plan, the Prudence Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

117. The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. Prudence Defendants did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the interest of Plan's participants. Instead, the Prudence Defendants selected and retained investment options in the Plan despite poor performance in relation to other comparable investments.

118. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Prudence Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan's participants would have had more money available to them for their retirement.

44

119.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiff is entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

120.    The Prudence Defendants knowingly participated in each breach, knowing that such acts were a breach, and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.

**COUNT II**
**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted against the Company Defendant)**

121.    Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

122.    Equitable (the "Monitoring Defendant") had the authority to appoint and remove members of the Administrative Committee and Investment Committee, and the duty to monitor the Administrative Committee and Investment Committee and were aware that the Administrative Committee and Investment Committee Defendants had critical responsibilities as fiduciaries of the Plan.

123.    In light of this authority, the Monitoring Defendant had a duty to monitor the Administrative Committee and Investment Committee Defendants to ensure that the Administrative Committee and Investment Committee Defendants

45

were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Administrative Committee and Investment Committee Defendants were not fulfilling those duties.

124. The Monitoring Defendant also had a duty to ensure that the Administrative Committee and Investment Committee Defendants possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; and reported regularly to the Monitoring Defendant.

125. The Monitoring Defendant breached its fiduciary monitoring duties by, among other things:

> (a)    Failing to monitor and evaluate the performance of the Administrative Committee and Investment Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Administrative Committee and Investment Committee Defendants' imprudent actions; and
>
> (b)    failing to remove Administrative Committee and Investment Committee members whose performance was inadequate, all to the detriment of the Plan and Plan's participants' retirement savings.

126. As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses. Had the Monitoring Defendant complied

with its fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

127. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Administrative Committee and Investment Committee Defendants. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

**COUNT III**
**Prohibited Transactions**
**(Against All Defendants)**

128. Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

129. ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), provides, in pertinent part, that "a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . (C) furnishing of goods, services, or facilities between the plan and a party in interest; [or] (D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan and a party in interest."

130. ERISA § 3(14), 29 U.S.C. § 1002(14), defines a "party in interest" to include (A) "any fiduciary . . . of such employee benefit plan;" (B) "a person

47

providing services to such plan;" (C) "an employer any of whose employees are covered by such plan," and "(H) any employee, officer, or director of such employer."

131.  ERISA § 3(9), 29 U.S.C. § 1002(9) defines "person" as "an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization."

132.  Defendants' decision to agree to pay excessive fees to Alight as recordkeeper for the Plan amounted to a direct or indirect "furnishing of goods, services, or facilities between the plan and a party in interest" pursuant to ERISA § 406(a)(1)(C) and the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan" pursuant to ERISA § 406(a)(1)(D).

133.  Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants, as fiduciaries to the Plan, are liable to restore to the Plan all losses caused by their violations of ERISA §§ 406(a)(1)(C) and (D).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

48

B.     Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C.     A Declaration that the Defendants have breached their fiduciary duties under ERISA;

D.     An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.     An order requiring the Company to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, as necessary to effectuate said relief, and to prevent the Defendants' unjust enrichment;

F.     Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.     An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.     Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I.     An award of pre-judgment interest;

J.     An award of costs pursuant to 29 U.S.C. § 1132(g);

K.     An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.     Such other and further relief as the Court deems equitable and just.

Dated: August 22, 2025                    Respectfully submitted,

                                          */s/ Mark K. Gyandoh*
                                          Mark K. Gyandoh, Esquire
                                          New Jersey Bar No. 025622001
                                          James A. Maro, Esquire
                                          New Jersey Bar No. 017052000
                                          **CAPOZZI ADLER, P.C.**
                                          312 Old Lancaster Road
                                          Merion Station, PA 19066
                                          Email: markg@capozziadler.com
                                                    jamesm@capozziadler.com
                                          Tel.: (610) 890-0200
                                          Fax: (717) 232-3080

                                          *Counsel for Plaintiff and the Putative Class*

50

## CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2025, a true and correct copy of the foregoing document was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.

By: */s/ Mark K. Gyandoh*