# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| HOLLIS TEDFORD, individually and on behalf of all others similarly situated, | ) )  ) |
| | ) **CIVIL ACTION NO.**: |
| | )  2:25-02180-JKS-AME |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| EQUITABLE FINANCIAL LIFE INSURANCE COMPANY, THE BENEFITS ADMINISTRATIVE COMMITTEE FOR THE EQUITABLE 401(K) PLAN, and THE INVESTMENT COMMITTEE FOR THE EQUITABLE 401(K) PLAN, | ) ) ) ) ) ) ) ) |
| | ) |
| Defendants. | ) |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................1

II.     FACTS ....................................................................................................3

        A.      Defendants Were Fiduciaries ...................................................3

        B.      Prohibited Transaction ..............................................................4

        C.      Defendants' Imprudence Surrounding the Fixed Income Fund

                1.      Background on GICs.......................................................5

                2.      The Fixed Income Fund and Comparator GICs...........6

III.    THE FAC IS SUFFICENTLY PLED ..................................................9

        A.      Legal Standard...........................................................................9

        B.      Defendants' Improper Sources.................................................12

        C.      The FAC is Timely under Tibble and Cunningham .................15

        D.      The GIC Allegations ...............................................................20

                1.      Defendants' imprudent processes ...............................17

                2.      Meaningful benchmarks...............................................20

                3.      There is a sufficient number of comparators ..............28

                4.      The extent of underperformance in sufficient............28

                5.      All named Defendants are liable..................................31

        E.      Recordkeeping Fees ................................................................32

                1.      Cuningham and Sweda ................................................32

2.    Alight was a party-in-interest ...................................................37

3.    Danza does not apply here........................................................39

V.    CONCLUSION ...................................................................................40

# TABLE OF AUTHORITIES

PAGE(S)

**Cases**

*Abbott v. Lockheed Martin Corp.*,
725 F.3d 803 (7th Cir. 2013)................................................................... 20, 24, 26

*Acosta v. Bd. of Trs. of Unite Here Health*,
2024 WL 3888862 (N.D. Ill. Aug. 21, 2024).........................................................23

*Albert v. Oshkosh Corp.*,
47 F.4th 570 (7th Cir. 2022)..................................................................................27

*Allen v. GreatBanc Tr. Co.*,
835 F.3d 670 (7th Cir. 2016) ........................................................................ 23, 38

*Anderson v. Intel Corp. Inv. Pol'y Comm.*,
137 F.4th 1015 (9th Cir. 2025)...............................................................................11

*Barchock v. CVS Health Corp.*, 8
86 F.3d 43 (1st Cir. 2018) .....................................................................................26

*Berkelhammer v. Automatic Data Processing, Inc.*,
2022 WL 3593975 (D.N.J. Aug. 23, 2022)................................................ 29, 31, 35

*Binder v. PPL Corp.*,
2024 WL 1096819 (E.D. Pa. Mar. 12, 2024)..........................................................11

*Braden v. Wal-Mart Stores, Inc.*,
588 F.3d 585 (8th Cir. 2009)................................................................10, 11, 23, 34

*Brotherston v. Putnam Invs., LLC*,
907 F.3d 17 (1st Cir. 2018) .......................................................................... 25, 26

*Cho v. Prudential Ins. Co. of Am.*,
2021 WL 4438186 (D.N.J. Sept. 27, 2021)...........................................................19

*Comerica Bank for DALRC Retiree Benefit Tr. v. Voluntary Emp. Benefits Assocs.*,
2012 WL 12948705 (N.D. Ga. Jan. 11, 2012).......................................................40

iii

*Cunningham v. Cornell Univ.*,
604 U.S. 693 (2025) ................................................................................*Passim*

*Cure v. Factory Mut. Ins. Co.*,
2025 WL 360622 (D. Mass. Jan. 31, 2025) ........................................................11

*Daggett v. Waters Corp.*,
731 F. Supp. 3d 121 (D. Mass. 2024) ........................................................... 15, 38

*Danza v. Fid. Mgmt. Tr. Co.*,
533 F. App'x 120 (3d Cir. 2013) ............................................................ 36, 38, 39

*Disselkamp v. Norton Healthcare, Inc.*,
2019 WL 3536038 (W.D. Ky. Aug. 2, 2019) ............................................. 5, 26, 29

*Ellis v. Fid. Mgmt. Tr. Co.*,
883 F.3d 1 (1st Cir. 2018) ...............................................................................25

*Fifth Third Bancorp v. Dudenhoeffer*,
573 U.S. 409 (2014)..................................................................................9, 10

*Fleming v. Rollins, Inc.*,
655 F. Supp. 3d 1243 (N.D. Ga. 2023)........................................................ 17, 38

*Forman v. TriHealth, Inc.*,
40 F.4th 443 (6th Cir. 2022)............................................................................27

*Hughes v. Nw. Univ.*,
595 U.S. 170 (2022)................................................................... 10, 16, 31

*Hughes v. Nw. Univ.*,
63 F.4th 615 (7th Cir. 2023).......................................................... 10, 18

*Johnson v. Parker-Hannifin Corp.*,
122 F.4th 205 (6th Cir. 2024)....................................................................10, 11

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ...........................................................................12

iv

*Kruchten v. Ricoh USA, Inc.*,
2024 WL 3518308 (3d Cir. July 24, 2024) ...........................................................2, 24

*Lacrosse v. Jack Henry & Assocs., Inc.*,
2024 WL 3564575 (W.D. Mo. July 11, 2024) .......................................................24
.

*Lalonde v. Mass. Mut. Ins. Co.*,
728 F. Supp. 3d 141 (D. Mass. 2024) ...................................................................31

*Luense v. Konica Minolta Bus. Sols. U.S.A., Inc.*,
541 F. Supp. 3d 496 (D.N.J. 2021) ..................................................................11, 19

*Matney v. Barrick Gold of N. Am.*,
80 F.4th 1136 (10th Cir. 2023) .............................................................................27

*Mator v. Wesco Distribution, Inc.*,
102 F.4th 172 (3d Cir. 2024)..........................................................................*Passim*

*Matousek v. MidAmerican Energy* Co.,
51 F.4th 274 (8th Cir. 2022)..................................................................................27

*McGowan v. Barnabas Health, Inc.*,
2021 WL 1399870 (D.N.J. Apr. 13, 2021)............................................................21

*Miller v. AutoZone, Inc.*,
2020 WL 6479564 (W.D. Tenn. Sept. 18, 2020) ..................................... 22, 24, 29

*Moler v. Univ. of Maryland Med. Sys.*,
2022 WL 2756290 (D. Md. July 13, 2022) ...........................................................14

*Morgan v. Pennsylvania*,
2023 WL 6461245 (M.D. Pa. Oct. 2, 2023) ..........................................................13

*Payne v. Hormel Foods Corp.*,
2024 WL 4228613 (D. Minn. Sept. 18, 2024) .................................................*Passim*

*Perkins v. United Surgical Partners Int'l*,
2024 WL 1574342 (5th Cir. Apr. 11, 2024)..........................................................23

v

*Pinnell v. Teva Pharm. USA, Inc.*,
2020 WL 1531870 (E.D. Pa. Mar. 31, 2020) .......................................................11, 19

*Pizarro v. Home Depot, Inc.*,
2019 WL 11288656 (N.D. Ga. Sept. 20, 2019) ......................................................25

*Pizarro v. Home Depot, Inc.*,
111 F.4th 1165 (11th Cir. 2024) ............................................................................25

*In re Quest Diagnostics Inc. ERISA Litig.*,
2021 WL 1783274 (D.N.J. May 4, 2021) ...............................................................29

*Santomenno ex rel. John Hancock Tr. v. John Hancock Life Ins. Co. (U.S.A)*,
768 F.3d 284 (3d Cir. 2014)............................................................................. 32, 38

*Schmidt v. Skolas*,
770 F.3d 241 (3d Cir. 2014).................................................................................2, 13

*Seibert v. Nokia of Am. Corp.*,
2024 WL 2316551 (D.N.J. May 22, 2024)......................................................*Passim*

*Spence v. Am. Airlines, Inc.*,
718 F. Supp. 3d 612 (N.D. Tex. 2024) ...................................................................11

*Sweda v. Univ. of Pennsylvania*,
923 F.3d 320 (3d Cir. 2019) .........................................................................*Passim*

*Terraza v. Safeway Inc.*,
241 F. Supp. 3d 1057 (N.D. Cal. 2017) ........................................................... 16, 31

*Tiara Yachts, Inc. v. Blue Cross Blue Shield of Michigan*,
138 F.4th 457 (6th Cir. 2025) ................................................................................36

*Tibble v. Edison Int'l*,
575 U.S. 523 (2015)......................................................................................*Passim*

*Tomaszewski v. Trevena, Inc.*,
482 F. Supp. 3d 317 (E.D. Pa. 2020) ............................................................. 12, 13

*Trs. of Gen. Assembly of Lord Jesus Christ of Apostolic Faith, Inc. v. Patterson*,
2023 WL 5338997 (E.D. Pa. Aug. 18, 2023) ...........................................................14

*Trs. of the Loc. 464A United Food & Com. Workers Union Pension Fund v.
Wachovia Bank*, *N.A.*,
2009 WL 2152074 (D.N.J. July 14, 2009)...............................................................23

*In re Unisys Sav. Plan Litig.*,
74 F.3d 420 (3d Cir. 1996) ..............................................................................*Passim*

*UFCW Loc. 56 Health & Welfare Fund v. Brandywine Operating P'ship, L.P*
2005 WL 3555390 (D.N.J. Oct. 28, 2005) ..............................................................39

*Victaulic Co. v. Tieman*,
499 F.3d 227 (3d Cir. 2007)...............................................................................2, 13

*VisionSoft Consulting, Inc. v. Cognitus Consulting, LLC*,
2020 WL 1466363 (D.N.J. Mar. 26, 2020).............................................................13

*Ybarra v. Bd. of Trs. of Supplemental Income Tr. Fund*,
2018 WL 9536641 (C.D. Cal. Nov. 5, 2018)..........................................................17

**STATUTES**

29 U.S.C. §§ 1106(a)(1)(C) .....................................................................................4

29 U.S. C. § 1113 ...................................................................................................15

**OTHER SOURCES**

The Employee Retirement Income Security Act of 1974................................*Passim*

Hollis Tedford, ("Plaintiff"), respectfully submits this Opposition to Defendants'[1] Motion to Dismiss ("MTD").

## I.   INTRODUCTION

Under the Employee Retirement Income Security Act of 1974 ("ERISA"), "[f]iduciary discretion must be exercised within the statutory parameters of prudence" under a "standard" that is "the highest known to the law.'" *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 333 (3d Cir. 2019) Using the proper "holistic evaluation of an ERISA complaint[,]" Defendants breached their fiduciary duties to the Equitable 401(k) Plan (f/k/a the AXA Equitable 401(k) Plan) (the "Plan") in numerous ways throughout the Class Period. Specifically, Defendants continuously failed to conduct prudent investigations into the Plan's Equitable Fixed Income Fund ("Fixed Income Fund") and the prevailing marketplace, as well as engaging in prohibited transactions with Alight Financial Solutions, LLC ("Alight"), a party in interest, under which Alight continuously received excessive compensation for recordkeeping and administrative ("RKA") services and indirect compensation from investments in the Plan. *See* ECF No. 14, Amended Complaint ("FAC").

Every one of Defendants' arguments for dismissal defies Supreme Court and Third Circuit precedent. Chiefly, *Tibble v. Edison Int'l*, 575 U.S. 523 (2015) (ERISA's six year statute of limitations does not begin the moment an investment or

---

[1] "Defendants" are defined in Section II.A, *infra*.

1

a contract is selected because the duty to prudently review investments and fees in ongoing, so breaches may occur after six years and be actionable); *Cunningham v. Cornell Univ.*, 604 U.S. 693 (2025) (recently reversing the dismissal of materially similar prohibited transaction claims and rejecting the same arguments that the MTD raises); *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 437 (3d Cir. 1996) ("*Unisys*") (the "terms of the Executive Life GICs" were "issues for trial" because "[t]he dramatic disparity between the interest rates that Executive Life offered and those offered by other" providers indicated imprudence); *Mator v. Wesco Distribution, Inc.*, 102 F.4th 172, 181-82, 186 n.4, 187 (3d Cir. 2024) (It is "important for courts not to disregard every less-than-identical comparator."); *id.*, at 185 (it is outside a fiduciary's "'range of reasonable judgments[,]'" to enable rate disparities of "several times" the rates of other plans); *Kruchten v. Ricoh USA, Inc.*, No. 23-CV-1928, 2024 WL 3518308 (3d Cir. July 24, 2024) (same); *Schmidt v. Skolas*, 770 F.3d 241, 249–50 (3d Cir. 2014) (non-governmental websites not referenced in the complaint were improperly considered); *Victaulic Co. v. Tieman*, 499 F.3d 227, 236 (3d Cir. 2007), *as amended* (Nov. 20, 2007) (same).

Factually, Defendants raise strawman arguments by ignoring well-pled allegations in the FAC and providing implausible, premature counterfactuals and mere speculation. Importantly, Plaintiff alleges *imprudent processes* as well as meaningful benchmarks to demonstrate the Fixed Income Funds' severe

2

underperformance. Even Defendants' own improper sources undermine their positions, such as the Fixed Income Fund's underperformance by comparison to other Stable Value Funds ("SVFs"). Regarding prohibited transactions, Plan documents concretely prove that Defendants admitted that Alight was a party-in-interest when the initial contract was signed, after the contract was amended, and for every year during the Class Period. For the reasons detailed *infra*, Plaintiff requests that Defendants' Motion be denied in its entirety.

## II.    FACTS

### A.    Defendants Were Fiduciaries

Company Defendant, Equitable, is the sponsor of the Plan and is a fiduciary of the Plan that appointed the members of the Administrative Committee and the Investment Committee to serve as "named fiduciaries" of the Plan. FAC, ¶¶ 33-39 (quoting the Auditor's Report attached to the 2023 Form 5500, at 2, 5). "The Plan's Investment Committee determines the Plan's valuation policies and procedures utilizing information provided by its investment advisors and trustees." *Id.*, ¶ 40 (quoting the Auditor's Report attached to 2023 Form 5500, at 8). "Equitable has expressly designated the Administrative Committee as the Plan Administrator of the Plan" with the "Powers and Responsibility of the Plan Administrator" including "to amend the group annuity contract or other funding agreement" and "to establish and carry out an investment policy and method consistent with the Plan objectives and

the requirements of any applicable law" and "To take any action necessary or appropriate to assure that the Plan assets are invested and that the Plan is administered for the exclusive purpose of providing benefits to Participants." Ex. A to the Declaration Of Sheila Labita ("Labita Decl."), "Excerpts of the Plan document." (Dkt. 15-3), at 82-83.

## B.      Prohibited Transaction

29 U.S.C. §§ 1106(a)(1)(C) provides that "(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect … (C) furnishing of goods, services, or facilities between the plan and a party in interest." Defendants caused the Plan to enter into an arrangement with Alight, formerly Aon Hewitt, wherein Alight received millions of dollars in RKA fees, as well as indirect compensation from the Plan in the form of revenue share being paid to Alight from investments. *See* FAC ¶¶ 18, 94, 106. Thus, "Alight was a party-in-interest and received income from funds maintained in the Plan" *Id*., ¶ 112.

Defendants and Alight worked out the details of an amended RKA agreement sometime in 2018. *See* Exhibit 1 to the Declaration of Mark Gyandoh ("Gyandoh Decl."). However, per Defendants, Alight was a party-in-interest as early as 2011 when original contract was signed, and thereafter. The "Related-Party Transactions" sections of numerous Department of Labor Form 5500s' Auditors' Reports for the

Plan explicitly list Aon Hewitt/Alight as parties in interest, including the year that the initial RKA contract was first entered. *See* Gyandoh Decl., Ex. 2 (Auditor's Report attached to 2012 Form 5500, at 19); Gyandoh Decl., Ex. 3 (Auditor's Report attached to 2011 Form 5500, at 17); Gyandoh Decl., Ex. 4, Auditor's Report attached to 2021 Form 5500, at 13-14. Notably, Sheila Labita, the affiant of the declaration provided by Defendants, is the same signatory confirming the accuracy of the Form 5500s. *See* Dkt. 15-2, ("I Sheila Labita, […] oversee the design and administration of the Equitable 401(k) Plan."); Gyandoh Decl., Ex. 3, 2011 Form 5500 at 1 (Ms. Labita declaring that she "examined this return/report, including accompanying schedules, statements and attachment" and "to the best of my knowledge and belief, it is true, correct, and complete."); Gyandoh Decl., Ex. 4, 2021 Form 5500 at 1 (same).

Defendants do not dispute that the fees were plausibly excessive. Although excessive fees are not pleading requirements in prohibited transaction cases, Plaintiff does so to demonstrate a redressable injury. *Id.*, ¶¶ 29-30.

C.    **Defendants' Imprudence Surrounding the Fixed Income Fund**

1.    **Background on GICs**

An SVF or Guaranteed Investment Contract ("GIC"), is "a contract, not a mutual fund investment." *Disselkamp v. Norton Healthcare, Inc.,* 2019 WL 3536038, at *5 (W.D. Ky. Aug. 2, 2019). GICs are intended to provide participants

5

with an option that protects their assets and provides meaningful returns. *See* FAC ¶ 75. GICs are issued by insurance companies (or "carriers") in the form of a fixed annuity contract, which guarantees a "crediting rate" of return during a specified period. *Id.*, ¶ 76. The marketplace for GICs is highly competitive. *Id.*, ¶ 83.

There are several different types of SVFs in the retirement plan marketplace that offer income preservation. *Id.*, ¶ 77. Large plans often offer synthetic GICs, which are the least risky type of GIC, where the principal is guaranteed by multiple wrap providers and the fund owns the assets of the underlying funds. *Id.* In separate account products the assets of the underlying funds are held in the separate account of an insurance carrier and there is only one "wrap" provider. *Id.*, ¶ 78. For separate account GICs, the insurer's payment obligations are putatively backed by a separate account, which is less susceptible to claims and liabilities against the insurer. *Id.* In general account GICs, funds are held unrestricted in the general account of the insurance carrier. *Id.*, ¶ 79.

### 2.    The Fixed Income Fund and Comparator GICs

The Fixed Income Fund is a "benefit-responsive synthetic" separate account GIC that can be "rebid" and its "variable crediting rate, [] typically resets at least quarterly." 2021 Form 5500 Auditor's Report at 11; *see also* FAC at ¶¶ 55, 89. "The Plan administrator does not believe that the occurrence of any such event, which would limit the Plan's ability to transact at contract value with participants, is

6

probable." *Id.*, at 13. The FAC includes several "Comparator GICs" for each year of the Class Period to demonstrate that better rates for nearly identical investments were available to the Plan but were not obtained by Defendants. *See* FAC, ¶¶ 84-85. The Comparator GICs all have the same leverage based on size. *Id.*, ¶ 88. Six Comparator GICs used one of the same carriers as the Fixed Income Fund (meaning they have the same entity crediting risk). *Id.*, ¶¶ 57, 85 (the Pomona Valley Hospital Medical Center Retirement Savings Plan ("Pomona Plan"), The Baylor College of Medicine Retirement Plan ("Baylor Plan"), The HCC Insurance Holdings Inc. 401(k) Plan ("HCC Plan"), International Imaging Materials Inc. Retirement and Investment Plan ("International Imaging Materials Plan"), Trugreen Profit Sharing and Retirement Plan ("Trugreen Plan"), Mattel, Inc. Personal Investment Plan ("Mattel Plan")).

Although it is not required at this stage, further details derived from the Form 5500s used in the FAC demonstrate other significant similarities between the Fixed Income Fund and the Comparator GICs. At least seven Comparator GICs were fully benefit responsive, reviewed quarterly, and their administrators did not believe that the plan would be unable to transact at contract value. *See* 2023 Form 5500 Auditor's Report, for the Pomona Plan, at Note E; Auditor's Report, attached to the 2019 Form 5500 for the HCC Plan, at Note 4; Auditor's Report, attached to the 2022 Form 5500 for the International Imaging Plan, at Note 2; Auditor's Report, attached to the 2021 Form 5500 for the Trugreen Plan, at Note 4; Auditor's Report, attached to the 2019

7

Form 5500 for the Transamerica 401(k) Retirement Savings Plan ("Transamerica Plan"), at 9; Auditor's Report, attached to the 2022 Form 5500 for the Allina 401k Retirement Savings Plan, at Note 5; Auditor's Report, attached to the 2020 Form 5500 for the American United Life Progress Sharing Plan and Trust, at Note 2. The auditors reports for the Pomona Plan, Transamerica Plan, Holzer Health System 401(a) Profit Sharing Plan ("Holzer Plan"), Gemba Group Annuity Plan,  Jackson National Life Insurance Company Defined Contribution Plan ("Jackson National Plan"), were all explicitly listed or described as being structured as a synthetic and/or separate account GIC. *See* 2023 Form 5500 Auditor's Report, for the Pomona Plan, at Note E; Auditor's Report, attached to the 2019 Form 5500 for the Transamerica Plan, at 9; Auditor's Report, attached to the 2021 Form 5500 for the Holzer Plan, at Note 3; Auditor's Report, attached to the 2021 Form 5500 for the Gemba Group Annuity Plan, at Note 4; Auditor's Report, attached to the 2022 Form 5500 for the Jackson National Plan, at Note 3.

Throughout the Class Period, the Fixed Income Fund underperformed the Comparator GICs by an average of ***almost 48%.*** FAC, ¶ 86. Notably, the Fixed Income Fund's credit rate ***decreased*** in 2021 at the same time the comparator rates ***increased***, with the Fixed Income Fund's subsequent increases in crediting rates being insufficient in light of the marketplace's potential. *Id.*, ¶ 87.

8

A prudent fiduciary would have known that the marketplace offered better rates for the same or similar GIC, particularly under its quarter review and reset standard. *Id.*, ¶ 89. Defendants were not required to ditch the Fixed Income Fund to satisfy their duty of prudence. A prudent fiduciary could have accomplished this goal by demanding higher crediting rates from the Insurance Companies and/or by submitting requests for proposals ("RFPs"), to other providers for bidding. *Id*.

## III.    THE FAC IS SUFFICIENTLY PLED

### A.    Legal Standard

"An ERISA fiduciary must discharge his responsibility 'with the care, skill, prudence, and diligence' that a prudent person 'acting in a like capacity and familiar with such matters' would use." *Tibble*, 575 U.S. at 528 (quoting § 1104(a)(1)). "Section 1104(a)(1) imposes 'strict standards'" for ERISA fiduciaries. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 416 (2014). "[A] court assesses a fiduciary's performance by looking at process rather than results, 'focusing on a fiduciary's conduct in arriving at [a] ... decision ... and asking whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment.'" *Sweda*, 923 F.3d at 329 (quoting *Unisys*, 74 F.3d at 434). A "fiduciary is required to conduct a regular review of its investment with the nature and timing of the review contingent on the circumstances[,]" but in all circumstances, this is a "continuing duty" where a fiduciary is liable for "failing to properly monitor

9

investments and remove imprudent ones." *Tibble*, 575 U.S. at 530. "Fiduciaries must also consider a plan's 'power ... to obtain favorable investment products[.]'" *Id*., at 328–29 (citation omitted). The Third Circuit has echoed the Supreme Court's holding that there is no "presumption of prudence" for ERISA fiduciaries. *Sweda*, 923 F.3d at 334 (quoting *Fifth Third Bancorp*, 573 U.S. at 412).

At this stage, "[c]ourts accept the factual allegations as true and view them in the light most favorable to the plaintiff." *Mator*, 102 F.4th at 178. Relatedly, "[e]ven when the alleged facts do not directly address[] the process by which the Plan was managed, a claim alleging a breach of fiduciary duty may still survive a motion to dismiss if the court, based on circumstantial factual allegations, may reasonably infer from what is alleged that the process was flawed." *Johnson v. Parker-Hannifin Corp.,* 122 F.4th 205, 219 (6th Cir. 2024). "This is because '[n]o matter how clever or diligent, ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences.'" *Id*. (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009)). "[T]he 'difficult tradeoffs' that an ERISA fiduciary faces, and the 'range of reasonable judgments' that may be made" are "alternative explanations [that] need not be conclusively ruled out at the pleadings stage." *Hughes v. Nw. Univ.*, 63 F.4th 615 (7th Cir. 2023) ("*Hughes II*") (quoting *Hughes v. Nw. Univ.*, 595 U.S. 170 (2022) ("*Hughes I*")). The Third Circuit and others agree with *Hughes II*. *See Mator*, 102 F.4th at 184

10

("Consistent with these rules, a plaintiff alleging an ERISA fiduciary breach need not 'rule out every possible lawful explanation for the conduct he challenges.'"); *Braden,* 588 F.3d at 597 (same); *Johnson*, 122 F.4th at 222 (same).

While the Eighth Circuit and some district courts have adopted a "meaningful benchmark requirement" for investment allegations, "the Court of Appeals for the Third Circuit is not one of them." *Binder v. PPL Corp.*, No. 22-CV-00133, 2024 WL 1096819, at *3 (E.D. Pa. Mar. 12, 2024).[2] However, as this Court aptly held, when using a comparison for pleading purposes, using real world examples that "share core similarities" will suffice as meaningful. *Seibert v. Nokia of Am. Corp*., No. 21-CV-20478, 2024 WL 2316551, at *3 (D.N.J. May 22, 2024) (Semper, J.). A defendant's dispute about the facts supporting the comparison are just that – factual and premature, because the "[t]he court accepts Plaintiffs' new support for their claim at the pleading stage." *Id*.; *see also Luense v. Konica Minolta Bus. Sols. U.S.A., Inc*., 541 F. Supp. 3d 496, 507, 511 (D.N.J. 2021) ("whether the alternative funds Plaintiff[s] suggest[ ] are apt comparisons is a question of fact unsuitable for resolution on a motion to dismiss."); *Pinnell v. Teva Pharm. USA, Inc*., No. 19-CV-

---

[2] Most Circuits do not require a meaningful benchmark. *See Johnson*, 122 F.4th at 216 (Plaintiffs in the Sixth Circuit are not "required to point to a higher-performing fund."); *Anderson v. Intel Corp. Inv. Pol'y Comm*., 137 F.4th 1015, 1023 (9th Cir. 2025) (same); *Spence v. Am. Airlines, Inc*., 718 F. Supp. 3d 612, 619 (N.D. Tex. 2024) ("[T]he Fifth Circuit has not imposed a performance-benchmark requirement."); *Cure v. Factory Mut. Ins. Co*., No. 23-cv-12399, 2025 WL 360622, at *5 (D. Mass. Jan. 31, 2025) ("the First Circuit has not adopted this approach.").

11

5738 2020 WL 1531870, at \*5 (E.D. Pa. Mar. 31, 2020) (the aptness of comparators are "factual questions" that "do not warrant dismissal—to the contrary, they suggest the need for further information from both parties."). Per the Third Circuit, comparisons may be "imperfect" and requiring specific benchmark criteria "would run counter to the required contextual analysis." *Mator*, 102 F.4th at 181, 187.

### B.    Defendants' Improper Sources

As a threshold matter, the MTD and Labita Decl. (Dkt. 15-1) violate the boundaries of Rule 12(b)(6) where "courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record."" *Tomaszewski v. Trevena, Inc*., 482 F. Supp. 3d 317, 326 (E.D. Pa. 2020). Like in *Tomaszewski*, Defendants' improper sources are an attempt "to 'improperly ... defeat what would otherwise constitute adequately stated claims at the pleading stage'" by creating a "'new version of the facts' based on these documents" and websites. *Id*., at 329 (quoting *Khoja v. Orexigen Therapeutics, Inc*., 899 F.3d 988, 998, 1002-03 (9th Cir. 2018)).

Most egregious is Defendants' reliance on the Stable Value Investment Association's (SVIA) website to embellish that there are "materially different characteristics" between SVFs. MTD at 5. As discussed *infra*, courts, including the Third Circuit, have found that these inherently factual counterarguments do not warrant dismissal. Most importantly, the Third Circuit has repeatedly made clear

that documents that are not "records of a government agency" and are from a "website" not referenced in the complaint are "improper." *Schmidt v. Skolas*, 770 F.3d 241, 249–50 (3d Cir. 2014); *see also Victaulic Co.*, 499 F.3d at 236 ("websites […] are not the sorts of "sources whose accuracy cannot reasonably be questioned," Fed.R.Evid. 201(b), that our judicial notice rule contemplates"); *Morgan v. Pennsylvania*, No. 23-CV-00872, 2023 WL 6461245, at *3 (M.D. Pa. Oct. 2, 2023) (websites of institutions are "not government-maintained" and thus inconsiderable).

Worse yet, Defendants improperly ask this Court to view debatable facts in their favor. *But see Tomaszewski*, 482 F. Supp. 3d at 326, 329; *VisionSoft Consulting, Inc. v. Cognitus Consulting, LLC*, No. 19-CV-11526, 2020 WL 1466363, at *9 (D.N.J. Mar. 26, 2020) ("the parties dispute the implications of the […] Commission website" so it cannot be subject to judicial notice). At most, the SVIA webpage supports the credibility of the FAC by stating that "no matter the type of management, all have a contractual element that protects against interest rate volatility in order to provide plan participants with safety, liquidity, and attractive returns." www.stablevalue.org/wp-content/uploads/StableValueMarketSegments-1.pdf (last visited Nov. 20, 2025). All SVF types aim to achieve meaningful returns and are overwhelmingly similar. Strikingly, the webpage demonstrates that the Fixed Income Fund, a separate account product, was below the five-year-performance average of the separate account category, because the Fixed Income Fund's returns

13

were always below 2.45%. *C.f. id*., at 2; FAC ¶ 86. These factual and credibility disputes demonstrate why the "[d]etermination of the adequacy or sufficiency of comparable benchmarks is a fact-intensive inquiry not properly resolved on a motion to dismiss, and one that may require expert opinion." *Moler v. Univ. of Maryland Med. Sys*., No. 21-CV-1824, 2022 WL 2756290, at *6 (D. Md. July 13, 2022).

Defendants also use "excerpts" from Form 5500s and fee disclosures to impermissibly ask this Court to accept a version of events in their favor. The "Excerpt" of the 2020 fee disclosure shows only two substantive pages of the entire report. *See* Labita Decl., Ex. E. Those pages reference another section showing Plan investments paying revenue sharing, but Defendants conveniently and improperly did not include that page. *See Trs. of Gen. Assembly of Lord Jesus Christ of Apostolic Faith, Inc. v. Patterson*, No. 21-CV-634, 2023 WL 5338997, at *6 n.9 (E.D. Pa. Aug. 18, 2023) ("the copy of the arbitration decree is incomplete, as the last page of the copy shows an incomplete paragraph which appears to continue onto the next (missing) page."). The exhibit still corroborates the prohibited transaction claim because it discusses Alight's revenue sharing payments in relation to the RKA fees as well as Alight's other sources of investment income from the Plan (the "SDBA fees"). *See* Labita Decl., Ex. E, at 2. Although the Form 5500s are referenced in the FAC, courts routinely refuse to accept factual disputes about comparisons based on varying interpretations of Form 5500s, such as Defendants' GIC arguments here.

14

Defendants' "own analysis of Form 5500 materials […] raise factual and legal disputes which cannot be resolved at this stage." *Daggett v. Waters Corp.*, 731 F. Supp. 3d 121, 136-37 (D. Mass. 2024); *see id*., at 137 n.18 ("Further discovery and analysis by the parties is appropriate."); *Schultz v. Aerotech, Inc*., No. 24-cv-618, 2025 WL 563585, at *4(W.D. Pa. Feb. 20, 2025) ("Both sides submitted […] Form 5500 data" but "[e]ven if the Court considered" the exhibits, "Defendants failed to articulate a natural, obvious or patently more reasonable explanation for their investment approach.").

### C.    The FAC is Timely under *Tibble* and *Cunningham*

Under § 1113(1), a suit must be filed within six years of "the date of the last action which constituted a part of the breach or violation." 29 U.S. Code § 1113. Plaintiff's claims are timely because they are properly limited to the transactions and breaches occurring within six years of the date the original complaint was filed. Defendants fail to mention the most binding precedent, *Tibble*, which recognizes a fiduciary's "a continuing duty to monitor investments." *Tibble*, 575 U.S. at 530. In *Tibble*, the Court held that because an ERISA fiduciary's duty is "continuing[,] […] so long as the alleged breach of the continuing duty occurred within six years of suit, the claim is timely." *Id.* The date of the initial contract and investments is irrelevant. Defendant's reliance on *Sweda* is misplaced, because "Sweda limited her claim to

15

the initial agreement" […] Sweda did not present this claim as an ongoing breach like the petitioners in *Tibble*." *Sweda*, 923 F.3d at 335.

The FAC alleges that Defendants continued to imprudently offer the Fixed Income Fund within six years before the lawsuit was filed, so the prudence claim is timely. *See Terraza v. Safeway Inc.,* 241 F. Supp. 3d 1057, 1068 (N.D. Cal. 2017) ("the alleged breach of fiduciary duty is not limited to the Defendants' initial selection of the challenged funds."); *In re Biogen, Inc. ERISA Litig*., No. 20-CV-11325, 2021 WL 3116331, at *3 (D. Mass. July 22, 2021) ("Plaintiffs' allegations, however, pertain to Defendants ongoing investment in these options […] and are not limited to when Defendants first selected these funds.").

The Supreme Court in *Cunningham* held that the "expenses" discussed in *Tibble* "include fees paid to service providers" in prohibited transaction claims. *Cunningham*, 604 U.S. at 698; *see also Hughes I*, 595 U.S. 170, 175 (ERISA's "continuing duty to monitor" applies to RKA fees). Because of the ongoing duty to monitor the Plan's RKA fees, including revenue sharing payments, Defendants "err[] by applying a 6–year statutory bar based solely on the initial" contract and not the subsequent transactions. *Tibble*, 575 U.S. at 530. Plaintiff's prohibited transaction claim is "timely under the six-year statute of limitations because 'Defendants ha[ve] a continuing duty" that extends "beyond their initial decision to enter into a revenue-sharing arrangement with the recordkeeper.'" *Ybarra v. Bd. of*

16

*Trs. of Supplemental Income Tr. Fund*, No. 17-CV-02091, 2018 WL 9536641, at *2 (C.D. Cal. Nov. 5, 2018); *see also Fleming v. Rollins, Inc.*, 655 F. Supp. 3d 1243, 1256 (N.D. Ga. 2023) (instructing that fiduciaries have a continuing duty to "review […] revenue sharing agreements, and expense fee arrangements", and upholding prohibited transaction claims based on revenue sharing payments).[3]

Plaintiff's claims are based on violations occurring within the statutory period.

## D.    The GIC Allegations

### 1.    Defendants' Imprudent Processes

The requisite "regular […] nature and timing of the review" *Tibble*, 575 U.S. at 530, here is that the Fixed Income Fund is to be reviewed and rebid quarterly which can be improved by RFPs and negotiations. *See* § II.C.2, *supra*; *Payne v. Hormel Foods Corp.*, No. 24 CV-545, 2024 WL 4228613, at *8 (D. Minn. Sept. 18, 2024) ("a prudent fiduciary would have leveraged the size of the plan to either negotiate a better deal" for the SVF or "replace it."). Contrary to Defendants' repeated mischaracterization of the FAC, Plaintiff alleges, with specificity, that Defendants had imprudent processes, not just "underperformance, without more." MTD at 1. In particular, Defendants failed to investigate or act on information demonstrating that the rates were not commensurate with what the marketplace was

---

[3] Hence why the RKA fees demonstrate fluctuating rates above Alight's $50 direct fee. *See* FAC, ¶ 106. The investments with revenue sharing tied to Alight's income changed from 2011-2021. *C.f.*, Form 5500 2011 at 28-29; 2021 Form 5500 at 26-28.

offering for similarly situated GICs. *See* § II.C.2, *supra*. Indeed, "the dramatic disparity between the interest rates" over several years infers that Defendants failed to even attempt to achieve a reasonable rate. *Unisys*, 74 F.3d at 437. Imprudent RFP and negotiation allegations sufficiently infer imprudent processes. *See id*. ("a reasonable factfinder could find that the investigations for the second and final GIC purchase were deficient."); *Mator*, 102 F.4th at 180 (upholding "the competitive bidding process" allegations); *Hughes II*, 63 F.4th 615 (same); *Tussey v. ABB, Inc*., 746 F.3d 327 (8th Cir. 2014) (the trial court correctly finding the failure to "negotiate" "determine" whether the rate "was competitive," and "adequately leverage the Plan's size" was imprudent). Even if considering a fiduciary's "'range of reasonable judgments[,]'" disparities of "several times" the rates of other plans and the failure to "negotiate" will "nudge the[] complaint across the line from conceivable to plausible." *Mator*, 102 F.4th at 185. These process failures apply to contract rates in GIC cases. *See Payne*, 2024 WL 4228613, at *8; *Unisys*, 74 F.3d at 437. The Form 5500s explicitly contemplates the ability to rebid and reset rates. *See* § II.C.2 *supra*. In *Carter*, the court explained that the plaintiffs did not allege underperformance alone, because the complaint "provides several examples of what a prudent process would look like" including RFPs. *Carter v. Sentara Healthcare Fiduciary Comm.*, No. 25-CV-00016 2025 WL 2427614, at *6 (E.D. Va. Aug. 11, 2025). "[I]f the Committee had no process for monitoring the [GIC], its decisions

18

were not within a 'range of reasonable judgments'" a fiduciary makes. *Id*., at \*5 (quoting *Hughes I*, 595 U.S. at 177). Because the rates could be improved without ditching the fund, Plaintiff need not allege that a prudent fiduciary "would have selected a different fund." MTD at 12 (quoting the mutual fund case of *Cho v. Prudential Ins. Co. of Am*., No. 19-CV-19886, 2021 WL 4438186, at \*7 (D.N.J. Sept. 27, 2021)). It is inferential that Defendants did not act with the "care, skill, prudence, and diligence" that other fiduciaries "in a like capacity and familiar with such matters" used, because the Fixed Income Fund's rates *decreased* when it should have *increased* and there were wide disparities between the Fixed Income Fund rates and the rates of comparable GICs, including GIC rates offered by the same carriers. *Tibble*, 575 U.S. at 528 (quoting § 1104(a)(1)).

The act of agreeing to a contract for a set return disproves Defendant's "hindsight" arguments, hence why Defendants fatally rely on mutual fund cases where the challenged investment's returns cannot be guaranteed. MTD at 10 (listing cases); *but see Disselkamp,* 2019 WL 3536038, at \*5; *Payne*, 2024 WL 4228613, at \*6. Defendants' cases involving "poor performance, standing alone" could not have had similar allegations regarding quarterly resetting of interest rates, nor bidding and negotiating on returns. MTD at 9. To be sure, the FAC includes information that was knowable when Defendants were obligated to conduct their quarterly reviews, including the Fixed Income Fund's unjustifiable rates in relation its bargaining

19

power, carriers, and the prevailing marketplace. *See* FAC, ¶ 85. Had Defendants prudently monitored the Fixed Income Fund and the marketplace, they would have recognized and achieved the better rates available. *See Unisys*, 74 F.3d at 435 ("the most basic of ERISA's investment fiduciary duties[] [is] the duty to conduct an independent investigation into the merits of a particular investment.").

### 2.   Meaningful Benchmarks

Defendants' arguments against the Fixed Income Fund are legally and factually unavailing. First, Defendants insert their own self-serving opinion as to what matters, which asks this Court to accept premature factual conclusions in Defendants' favor. *But see Seibert*, 2024 WL 2316551, at *3; *Luense*, Inc., 541 F. Supp. 3d at 507, 511; *Pinnell*, 2020 WL 1531870, at *5. Second, Defendants raise the standard of comparison to a level of detail that the Third Circuit has held is improperly high and "would run counter to the required contextual analysis." *Mator*, 102 F.4th at 181, 187. One salient part of the context here is that this case involves GICs, not mutual funds. *See Unisys*, 74 F.3d at 437; *Disselkamp*, 2019 WL 3536038, at *5; *Abbott v. Lockheed Martin Corp*., 725 F.3d 803, 806-07 (7th Cir. 2013*)* (the SVF plausibly had such "a low rate of return" that it did not "provide a meaningful retirement asset" compared to "a variety of stable value funds."). Third, like in *Seibert*, the Comparator GICs all share the same "core similarities" and thus are sufficiently similar at this stage. *Seibert*, 2024 WL 2316551, at *3; § II.C.2, *supra*.

20

Truly, the Comparator GICs are of the same "type" and have the same "characteristics" as the Fixed Income Fund. MTD at 1-2.

"Defendants contend that there are varying types of" contract terms and aspects that matter (they do not), but such "a factual claim [] must be determined at a later stage." *Kruchten*, 2024 WL 3518308, at *3. Specifically, Defendants provide no legal support for their argument that Plaintiffs must allege whether the Fixed Income Fund and Comparator GICs' plans have "a right to information about the fund's underlying investments; (ii) the speed and costs of removing the fund from the plan; (iii) how much and how the insurers are paid; and (iv) the methodology for how crediting rates are determined." MTD at 5. Defendants merely cite an improper website that is not authoritative or references in the FAC, thereby demonstrating the purely factual argument that Defendants prematurely raise. *See Schmidt*, 770 F.3d at 249–50; *Victaulic Co.*, 499 F.3d at 236.

None of these purely hypothetical factors are germane to Plaintiffs' theory of liability nor would they justify the unreasonably low rates. Rather, Defendants' proffered list is precisely the type of "bright line" pleading standard that would require Plaintiffs to "'rule out every possible lawful explanation'" no matter how nonobvious, that the Third Circuit has expressly forbid. *Mator*, 102 F.4th at 184; *see also McGowan v. Barnabas Health, Inc.*, No. 20-cv-13119, 2021 WL 1399870, at *6 (D.N.J. Apr. 13, 2021) ("The Fiduciaries next attack specific allegations and defend

21

certain practices, relying on out-of-Circuit authority. […] This approach bucks the Third Circuit's requirement of a holistic inquiry."); *Trs. of the Loc. 464A United Food & Com. Workers Union Pension Fund v. Wachovia Bank*, *N.A.*, No. 09-cv-668, 2009 WL 2152074, at *3-4 (D.N.J. July 14, 2009) ("*Loc. 464A*") (Denying dismissal in a case involving "fixed-income portfolios" where the defendants "argu[ed] that Plaintiffs' complaint lacks specificity and fails to include facts showing that 'the fiduciary had not made the necessary investigation.'").

What happens in the rare event of removing the fund from a plan is not an obvious justification for continuously dismal rates. Other courts have held that a GIC's "underlying investment portfolio" is neither relevant nor undermines the plausibility of the unjustifiably low rates. *Miller v. AutoZone, Inc*., No. 19-CV-02779, 2020 WL 6479564, at 5-6 (W.D. Tenn. Sept. 18, 2020). In *Wood*, the court denied the defendants' motion to dismiss because "the benchmark and methodology used to set the interest rate, the prevailing rates for comparable investments, and other factors bearing on the reasonableness of the interest rate and the allocation of risk, are fact specific and render dismissal premature now at the motion to dismiss stage." *Wood v. Prudential Ret. Ins. & Annuity Co.*, No. 15-CV-1785, Slip Op., at 10 (D. Conn. Sept. 29, 2016) (Gyandoh Decl., Ex. 7) (citing *Lau v. Metropolitan Life Insurance Co*., No. 15-CV-09469, 2016 WL 5957687, at *3-5 (S.D.N.Y. Aug. 22, 2016). At most, it is plausible that the method for calculating the Fixed Income

22

Fund's returns, or failure to consider the prudence of that method, was a cause, rather than an excuse, for the poor returns. *See Braden*, 588 F.3d at 596 ("[I]t is reasonable, [] to infer from what is alleged that the process was flawed" and "tainted by failure of effort, competence, or loyalty."); *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 680 (7th Cir. 2016) ("whether the 22% decline in value […] was the result of normal economic forces or something more sinister is a matter for a later stage."); *Perkins v. United Surgical Partners Int'l*, Inc., 2024 WL 1574342, at *3 (5th Cir. Apr. 11, 2024) (the defendants' reasoning was "severely undercut by the Plaintiffs' allegation that the Plan's" rates "were significantly [worse] than those of comparable plans."); *Acosta v. Bd. of Trs. of Unite Here Health*, No. 22-CV-1458, 2024 WL 3888862, at *5 (N.D. Ill. Aug. 21, 2024) (such a "discrepancy" "demonstrate[d] not only consistency but some likelihood that the fiduciary failed to conduct regular reviews of its investment."). Any deeper level of knowledge regarding the method for calculating returns is in the sole possession of insurers and fiduciaries, hence why Plaintiffs are not required to include this information. *See Payne*, 2024 WL 4228613, at *4 ("[t]he Court must take into account the practical reality that ERISA plaintiffs 'generally lack the inside information necessary to make out their claims in detail unless and until discovery commences.'"). Further, Defendants ignore many critical allegations, such as risk, objectives, and leverage. For instance, allegations that the

23

marketplace is "competitive are not mere 'conclusions'" but actually "well pled" and "must be taken as true." *Kruchten*, 2024 WL 3518308, at *3; *see* FAC ¶ 83 (same).

The Fixed Income Fund's purpose was not just to "preserve[] participants' capital." MTD at 11. Hence why the rates could be reset quarterly, rebid, and negotiated like other GICs, *see* § II.C.2, *supra,* and why performance claims are plausible even though all GICs include the goal of asset preservation. *See, e.g., Carter*, *Unisys*, *Abbott*, *Miller,* 2020 WL 6479564, at 5-6 (W.D. Tenn. Sept. 18, 2020) (a "table comparing the crediting rate[s][,]" plausibly demonstrated that the GIC was "consistently underperforming."); *Payne*, 2024 WL 4228613, at *6-7 (noting that a GIC's "associated risk level is a creature of their structural design rather than their investment strategy" and general account GICs can be compared to separate account GICs); *Lacrosse v. Jack Henry & Assocs.,* Inc., 2024 WL 3564575, at *3 (W.D. Mo. July 11, 2024) (similar). For the same reason, merely having a "positive return" is does not warrant dismissal. MTD at 11. *See Olsen v. Hegarty*, 180 F. Supp. 2d 552, 569 (D.N.J. 2001) ("neither may the Court conclude that these same duties were not violated simply because the [stable value] Fund did not suffer huge actual losses."); *Lau*, 2016 WL 5957687, at *5 ("At this stage, the Court cannot definitively conclude that the minimum rate of return was reasonable.") *Loc. 464A*, 2009 WL 2152074, at *4 (same). Truely, a survey of caselaw from courts around the Nation and especially in this Circuit disprove Defendants' hypothesis that courts are

24

"especially skeptical of challenges to stable value investments" MTD at 10. *See Unisys; Olsen; Loc. 464A.* The rate matters.

The First Circuit explicitly rejected Defendants' theory that safe investments immunize ERISA fiduciaries from liability. "[A] trustee who decides to stuff cash in a mattress cannot assure that there is no loss merely by holding onto the mattress." *Brotherston v. Putnam Invs., LLC*, 907 F.3d 17, 31 (1st Cir. 2018). Hence why fiduciaries renegotiate rates in GICs. *See* FAC ¶ 89; *Unisys; Miller; Payne; Carter.* As a matter of law, "[i]f a prudent fiduciary would have discovered additional information that prompted a different investment course, then the Defendants' claim that the Plan is without loss is consequently without merit." *Olsen*, 180 F. Supp. 2d at 572 (denying the defendants' motion for summary judgment in an SVF case). Importantly, Plaintiff is not alleging that the Fixed Income Fund was managed "too conservative[] and not invest[ed] in higher-risk, higher-return investments." MTD at 10. Defendants provide no quote from the FAC to support their strawman argument. Nor do Defendants' proffered cases support dismissal. For starters, the *summary judgment* decisions in *Pizarro v. Home Depot, Inc.*, 111 F.4th 1165, 1179-80 (11th Cir. 2024) and *Ellis v. Fid. Mgmt. Tr. Co.*, 883 F.3d 1 (1st Cir. 2018), supports that Defendant's factual disputes necessitate discovery. On the other hand, the *motion to dismiss* decision in *Pizarro* held that the defendant's beliefs about "meaningful benchmarks" was premature. *Pizarro v. Home Depot, Inc.*, No. 18-CV-01566, 2019

25

WL 11288656, at *3 (N.D. Ga. Sept. 20, 2019). As discussed, the same is true in the Third Circuit. *Ellis* is also materially distinct because that theory was based on "competitor access to wrap capacity[,]" not the level of risk and reward in the challenged fund. *Ellis*, 883 F.3d, at 7. Plaintiff makes no similar anti-competitive allegation here, and *Ellis* was decided "[a]fter a full round of discovery." *Id*. Notably, the First Circuit also found that all SVFs have the same "typical features" that are "salient." *Id*. at 3 (they are all "relatively safe investment vehicle[s], described as an 'income producing, low risk, liquid' investment."). *Barchock* also involved a different theory of liability where the issue was not the rate of return, but instead "***solely***" that the "cash-equivalent allocation 'departed radically' from both industry averages and the underlying financial logic of stable value management." *Barchock v. CVS Health Corp*., 886 F.3d 43, 52 (1st Cir. 2018) (emphasis added). That particular SVF's ***fund-specific*** "stated objective" warranted dismissal, whereas there is no such allegation or Fixed-Income-Fund-specific objective here. *Id*., at 49. Defendants' misconstruction of *Ellis* and *Barchock* is bellied by *Brotherston* which was issued that same year. Plus, *Unisys*, *Mator*, and *Ricoh* control in this Circuit.

Defendants' other out-of-circuit cases are similarly misplaced because they do not comport with the Third Circuit's pleadings standards and analyzed much less robustly pled mutual fund comparisons – not SVFs. *But see Payne*, 2024 WL 4228613, at *6; *Disselkamp*, 2019 WL 3536038, at *5; *Abbott*, 725 F.3d at 806-07.

26

For instance, Defendants point to the holding in *Matney*, but the Tenth Circuit warned that "[w]hat makes a[n] [investment] comparison meaningful […] will depend on context." *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1148 (10th Cir. 2023). Defendants' decisions involved mutual funds and less robust comparisons, such as *Smith v. CommonSpirit Health*, 37 F.4th 1160 (6th Cir. 2022), *Matousek v. MidAmerican Energy* Co., 51 F.4th 274, 281 (8th Cir. 2022) and *Albert v. Oshkosh Corp.*, 47 F.4th 570, 582 (7th Cir. 2022). Subsequent decisions have readily distinguished those cases. *See Mator*, 102 F.4th at 188 ("the Mators give the context the *Smith* [] plaintiffs omitted: they provide specific plan comparators, not just industry averages."); *Payne*, 2024 WL 4228613, at *6 ("*Meiners*, *Davis*, and *Matousek* are instructive as to what investment comparators can function as a meaningful benchmark[,]" and their holdings still permit different SVF types to be comparable); *Acosta*, 2024 WL 3888862, at **7-8 ("Nothing in either *Albert* or *Hughes*" supported what the defendant believed should be included because those aspects "go to the merits of" a claim, and would "require factual development."). Defendants also cite *Forman* where the Sixth Circuit actually reversed part of the district court's dismissal, because the complaint plausibly alleged that the challenged "fund guarantees worse returns." *Forman v. TriHealth, Inc.*, 40 F.4th 443, 451 (6th Cir. 2022). Likewise, the Fixed Income Fund guaranteed worse returns.

Lastly, even if, *arguendo*, some of the FAC's allegations are "conclusory" MTD at 14 (quoting *Sweda*, 923 F.3d at 330), *Sweda* instructs that the FAC survives because "many well-pleaded factual allegations remain." *Sweda*, 923 F.3d at 330.

### 3.    There is a sufficient number of comparators

Defendants concede that the Complaint includes fifteen Comparators and at least "two funds" were used for every year in the FAC. MTD at 12. Even two comparators are sufficient. *Seibert*, 2024 WL 2316551, at *3 (two comparator investments were sufficient); *Payne*, 2024 WL 4228613, at *2 (same); *see also Mator*, 102 F.4th at 187 (eliminating unconvincing comparators "would leave four of the eleven comparators. Four does not seem insufficient."). If anything, the fact that there are fifteen different comparators with little duplication that all had lower rates under the same circumstances shows how the overall GIC marketplace offered better rates. Defendants provide no legal support for their belief that Plaintiff must use only the same comparators for each year. Using different comparators for different years (or only one year) was found to be sufficient by the Third Circuit in *Kruchten*. *See* Gyandoh Decl., Ex. 6 (*Kruchten* Complaint), ¶ 111; *Carter*, 2025 WL 2427614, at *5 n.7 ("plaintiffs do not fail to allege underperformance merely because they use a measure with which [Defendant] disagrees.").

### 4.    The extent of underperformance is sufficient

28

The "nature and timing" analytical framework of the Fixed Income Fund is that the rate is guaranteed and reset quarterly, *Tibble,* 575 U.S. at 530. In *Payne* and *Terraza*, a period of six years of data was sufficient for GIC claims. *See Payne*, 2024 WL 4228613, at \*\*7-8. In this Circuit, "five of six calendar years" is routinely held to be sufficient, even when challenging mutual funds. *In re Quest Diagnostics Inc. ERISA Litig.*, No. 20-CV-07936, 2021 WL 1783274, at \*3 (D.N.J. May 4, 2021); *see also Binder*, 2024 WL 1096819, at \*3 ("January of 2015 through the end of 2017" was sufficient); *Johnson*, 122 F.4th at 216-18 (two years was sufficient); *Berkelhammer v. Automatic Data Processing*, *Inc.*, No. 20-CV-5696, 2022 WL 3593975, at \*8 (D.N.J. Aug. 23, 2022) ("Whether underperformance is modest and short in duration raise factual questions that should be tested through discovery, not summarily decided at the motion-to-dismiss stage."). GICs do not have a "long-term" strategy like mutual funds, so Defendants' cases are misplaced. MTD at 12, *but see Payne*, 2024 WL 4228613, at \*6-7; *Disselkamp*, 2019 WL 3536038, at \*8 ("[I]f a predictable investment continues to chronically underperform, one could draw a conclusion that the fiduciaries overseeing that fund have breached their duty.").

The Fixed Income Fund's average underperformance against the Comparator GICs was almost 48%, and over 3% at times on an absolute basis. FAC, ¶¶ 85-86. The degree and duration of underperformance here is higher than in upheld GIC

29

cases with the same theory of liability, as well as other investment cases in this Circuit. *See Payne*, 2024 WL 4228613, at **6-7 (underperformance as small as 0.71% inferred imprudence); *Miller*, 2020 WL 6479564, at *5 (average underperformance of 2.20% was sufficient); *Carter*, 2025 WL 2427614, at *6 ("the Court reasonably infers that 1.36% is sufficient underperformance for the Committee to intervene.").

Defendants' unavailing attempt to reframe the well-pled extent of underperformance in the FAC relies on cases that involved mutual funds and different theories of liability. In reality, Defendants misstate the law and improperly ask this Court to accept a dispute of fact, meaning the reasonableness of returns, in their favor. There is no minimum rate of underperformance for SVFs or any investments to state an imprudence claim in the Third Circuit. A breach "cannot be measured by 'hard and fast rules'" and there is no minimum "degree" of a breach required to state a claim, "because a prudent fiduciary must consider the facts and circumstances of each case." *Loc. 464A*, 2009 WL 2152074 (quoting *Unisys*, 74 F.3d at 438). In *Olsen*, the SVF "met or exceeded the 7.5% benchmark" which is far higher than crediting rates of the Fixed Income Fund. *Olsen*, 180 F. Supp. 2d at 570. The court denied the defendant's motion for summary judgment, holding that "[i]t is not within the province of this Court to create an artificial standard of return [...] to determine whether a violation of fiduciary duty has occurred" because the focus is

30

on "the particular behavior and decision-making processes." *Id*., at 569 ("neither may the Court conclude that these same duties were not violated simply because the Fund did not suffer huge actual losses."); *see also Berkelhammer*, 2022 WL 3593975, at *8. Although *Cho* may have held differently (MTD at 12), *Berkelhammer* and *Binder* are more persuasive, because they were decided after the Supreme Court issued *Hughes I*, and *Olsen* was a published opinion involving an SVF. Defendants only SVF case is *Lalonde v. Mass. Mut. Ins. Co*., 728 F. Supp. 3d 141 (D. Mass. 2024), from another Circuit. *Lalonde* is equally distinguishable because Plaintiff here is not alleging that Defendants should have "offer[ed] any particular type or mix of funds[,]" and the instant Complaint's comparisons include far more than two funds with "only a modest superiority." *Lalonde*, 728 F. Supp. at 156; *c.f.*, FAC, ¶¶ 85-86. Like here, the defendants in *Payne* attempted to rely on *Lalonde*. *See Payne*, 2024 WL 4228613, at *7. The court noted that other courts have "reached the opposite conclusion[,]" such as *Terraza* and *Miller*, where the courts "observ[ed] that consistent underperformance of a stable value product over time supports an inference of imprudence." *Payne*, 2024 WL 4228613, at *7 (listing cases). The Fixed Income Fund's underperformance, as a result of Defendants' imprudent processes, is sufficiently alleged.

     **5.**     **All named Defendants are liable**

The Administrative Committee is plausibly "a fiduciary with respect to the Plan's investments." MTD at 15. In fact, the Plan Document explicitly states that the "the Administrative Committee" has the "Powers and Responsibility" to "carry out an investment policy" and "assure that the Plan assets are invested" in accordance with ERISA. Labita Decl., Ex. A at 82-83. Accordingly, the Administrative Committee "possesses authority or discretionary control over the plan," including "with respect to the *particular activity in question[,]*" meaning overseeing the prudence of Plan investments. *Santomenno ex rel. John Hancock Tr. v. John Hancock Life Ins. Co. (U.S.A)*, 768 F.3d 284, 291 (3d Cir. 2014) (emphasis in original). The Administrative Committee's fiduciary duties encompass the monitoring of the Fixed Income Fund.

Also, Plaintiff's "failure to monitor [other fiduciaries] claim derives from the primary claim of breach of the duty of prudence" and therefore survives with the underlying breaches. *Mator*, 102 F.4th at 191; *see also Seibert*, 2024 WL 2316551, at *4. Because Plaintiffs' breach of fiduciary duty of prudence is plausibly alleged, so too is Plaintiff's failure to monitor claim.

### E.    Recordkeeping Fees

#### 1.    *Cunningham* and *Sweda*

For the reasons stated *supra*, and set forth in *Tibble*, *Cunningham*, and *Sweda*, Plaintiff's prohibited transaction claim is timely and not limited to the transaction of

the initial contract. Defendants' prohibited transaction arguments are eviscerated by other holdings set forth in *Cunningham* and *Sweda*. As a foundational matter, the MTD does not mention the investment income or revenue share (indirect fees) that Alight received, which mirrors the prohibited transaction claim held to be sufficient in *Cunningham*. Instead, Defendants fatally rely on cases that have been effectively overturned by *Cunningham* and/or involved materially different transactions.

This year, the Supreme Court in *Cunningham* reversed the lower court's dismissal of a nearly identical prohibited transaction claim. The facts underlying *Cunningham* were that "[i]n 2011, Cornell retained the Teachers Insurance and Annuity Association of America-College Retirement Equities Fund (TIAA) and Fidelity Investments Inc. (Fidelity). TIAA and Fidelity offered investment options to plan participants and served as recordkeepers for the retirement plans […] Cornell compensated TIAA and Fidelity with fees from a set portion of plan assets." *Cunningham*, 604 U.S. at 698. The plaintiffs alleged that "[t]hese transactions occurred each time the Plans paid fees to TIAA-CREF in connection with the Plans' investments." *Cunningham v. Cornell University*, 16-cv-06525 (S.D.N.Y Feb. 24, 2017) (Dkt. 81), ¶ 217. Both the <u>initial transactions</u> **and** <u>subsequent payments</u> were held to be prohibited transactions under §1106(a) by the Supreme Court. Plaintiff here, exactly like in *Cunningham*, alleges that since at least 2011 "Alight was a party in interest to the Plan as it was receiving compensation for RKA services, as well as

33

indirect compensation from the Plan in the form of revenue share being paid to Alight from [investment] funds in the Plan." FAC ¶ 94; *see also id*., ¶¶ 18, 106, 112.

Contrary to Defendants' argument, "each payment to Alight pursuant to the terms of the contract is a prohibited transaction" because, per *Cunningham*, "payments to a service provider for [recordkeeping] services pursuant to a contract" constitutes a prohibited transaction, especially when revenue sharing in involved. MTD at 19. In *Cunningham*, the Court mandated that "[n]othing in that section [1106(a)(1)(C)] removes from its ***categorical bar transactions that were necessary for the plan or involved reasonable compensation***. Accordingly, under § 1106(a)(1)(C), plaintiffs need only plausibly allege each of those elements of a prohibited-transaction claim […], no more, no less." *Id*., at 700, 708-09. Hence, Defendants' argument that Plaintiffs must "allege that Alight was paid anything beyond what was due under its contract with the Plan" has been rejected by the Supreme Court. MTD at 19. The Court confirmed that the Eighth Circuit's framework in *Braden* is the correct framework for Prohibited Transaction Claims, rather than the Third Circuit's approach. *See Cunningham*, 604 U.S. at 700. In *Braden*, there was a plausible prohibited transaction where the "complaint alleges that appellees caused the Plan to **_enter_** into an arrangement with Merrill Lynch, a party in interest, under which Merrill Lynch received […] revenue sharing payments in exchange for services rendered." *Braden*, 588 F.3d at 601 (emphasis added).

34

The Third Circuit in *Sweda* also considered a prohibited transaction claim involving revenue sharing, but the holding is mostly overturned by *Cunningham*. The Third Circuit refused "to recognize a per se rule that every furnishing of goods or services between a plan and party in interest is a prohibited transaction under § 1106(a)(1)." *Sweda*, 923 F.3d at 336. However, the Supreme Court held that "Congress intended for § 1106(a) to create '*per se* prohibitions on transacting with a party in interest'" such as the transactions here and in *Cunningham*, and thus "because § 1106(a), by its terms, sets out *per se* prohibitions, it would make little sense to put the onus on plaintiffs to plead and disprove any potentially relevant separate § 1108 exemptions." *Cunningham*, 604 U.S. at 705. This includes the § 1108(b)(2)(A) exemption for "<u>making reasonable arrangements</u>" for "services <u>necessary</u> for the establishment or operation of the plan[,]" which in the case of *Cunningham* and *Sweda* was for recordkeeping services. *Id*., at 697. All contracts for the "**establishment**" of a plan, *id*., will necessarily be "initial" contracts so Defendant' argument that recordkeeping and revenue sharing 'payments' made consistent with the terms of the recordkeeping contract are not "'transactions' within the meaning of section 406" contradicts the Statute and defies Supreme Court precedent. MTD at 17. The Statute does not bar claims against fiduciaries "paying third parties to perform essential services[,]" from the initial agreement or thereafter. *Cunningham*, 604 U.S. at 699; *see also Berkelhammer*, 2022 WL 3593975, at *14

35

(upholding a prohibited transaction claim after *Sweda* and *Danza v. Fid. Mgmt. Tr. Co.*, 533 F. App'x 120 (3d Cir. 2013), where "The parties may dispute the appropriateness, legitimacy, or reasonableness of fees paid to TotalSource[,]" "[b]ut those disputes are better suited for summary judgment or at trial, not at the motion-to-dismiss stage."). *Sweda* also incorporated an extra "element of intent to benefit a party in interest." *Sweda*, 923 F.3d at 338. *Cunningham* has reversed this because Plaintiffs need only "allege that a plan fiduciary engaged in a transaction proscribed therein, no more, no less." *Cunningham*, 604 U.S. at 709; *see also Tiara Yachts, Inc. v. Blue Cross Blue Shield of Michigan*, 138 F.4th 457, 467 (6th Cir. 2025) (In light of *Cunningham*, prohibited transaction are "presumptively unlawful […] no matter whether the plaintiff alleges the defendant acted 'out of fraud or imprudence.'").[4]

There are two critical holdings in *Sweda's* prohibited transaction decision that remain good law and defeat Defendants' motion. In *Sweda*, the Third Circuit held that "prohibited transactions occurred <u>every time property was exchanged or services were rendered</u> pursuant to the 'lock-in' agreement" and the subsequent

---

[4] All of Defendants' other cases are no longer good law because they incorrectly interpreted the Statute and Congresses intent in a way that erroneously narrowed which prohibited transaction claims can be brought. *See Chavez v. Plan Benefit Servs., Inc.*, No. 17-CA-00659, 2018 WL 6220119, at *3 (W.D. Tex. Sept. 12, 2018) (the court impermissibly "read § 1106(a) in conjunction with § 1108"); *Markham*, 88 F.4th at, 612 (same); *Bouvy v. Analog Devices, Inc.*, No. 19-CV-881, 2020 WL 3448385, at *11 (S.D. Cal. June 24, 2020) (erroneously holding that "revenue sharing is not a prohibited transaction.").

36

transactions may be "related" but are _separate_ transactions from the initial agreement. *Sweda*, 923 F.3d at 339 (emphasis added); *see also Cunningham*, 604 U.S. at 698. "Sweda plausibly alleged that TIAA-CREF and Vanguard were parties in interest under § 1002(14)(B) because they ***provided services to the plan at the time fees were paid***, and Penn's ***own Plan materials identify TIAA-CREF and Vanguard as parties in interest***. At the pleadings stage, we must assume that this well-pleaded fact is true." *Sweda*, 923 F.3d at 339.

### 2.    Alight was a party-in-interest

Alight was a party-in-interest during the Class Period and when the contract was signed, but, of course, the FAC is only concerned with the transactions occurring during the class period. ERISA "defines 'party in interest' to include […] entities 'providing services to [the] plan.'" *Cunningham*, 604 U.S. at 69791 (quoting § 1002(14)). Alight's party in interest status is the same party in interest status held to be sufficient in *Cunningham*. Further, like in *Sweda*, Alight's party in interest status is proven by the Plan's own documents– including the year of the initial RKA contract, and after the contract was amended. *See* Gyandoh Decl., Exs. 2-4. It is an admission that the Form 5500s state that "The Plan administrator and the Plan's counsel believe that the Plan's transactions with related parties and parties-in-interest" fell under the "exemptions" *id*., because "the exemptions from prohibited transactions do not provide alternative explanations; they assume that a transaction

37

in the prohibited group occurred." *Allen*, 835 F.3d at 676. Defendants cannot in good faith now argue that Alight was <u>not</u> a party-in-interest when the contract was entered into nor after it was amended. *See Daggett*, 731 F. Supp. 3d at 136-37 (Form 5500s are viewed in Plaintiffs' favor); *Santomenno*, 768 F.3d at 293 (It is the fiduciary "who decides whether to agree to the service provider's terms.").[5]

Ultimately, however, what matters is that Alight was a party-in-interest *during* the Class Period, which is not limited to the recordkeeping agreement from before the Class Period, but also includes the RKA transactions and the investment fund transactions during the Class Period. *See Cunningham*, 604 U.S. at 704-05; *Fleming*, 655 F. Supp. 3d at 1260 ("Plaintiffs [plausibility] allege that the Rollins Defendants, who are Plan fiduciaries, caused Plan assets to be transferred to […] 'parties in interest,' through excessive revenue sharing agreements.").

Finally, in Defendants' case of *Danza,* the Third Circuit found that there was no party interest transaction under the original contract "based on [the] Plaintiff's allegations" stating so. *Danza*, 533 F. App'x at 124. Dissimilarly, Plaintiff expressly alleges that Alight was a party in interest at all times. *See* FAC, ¶ 112.

---

[5] Alternatively, even by Defendants' now overturned caselaw, Alight was a "provider[] with a preexisting relationship with a plan" at the time the contract was amended, therein making Alight a party in interest before the payments made during the Class Period. *Markham*, 88 F.4th at 610); *but see Danza,* 533 F. App'x at 125 (the recordkeeper was at least "currently a party in interest as a service provider to the plan" when the complaint was filed).

### 3.    *Danza* **does not apply here.**

Again, *Cunningham* and *Sweda* held that revenue sharing arrangements can constitute a prohibited transaction, and prohibited transactions include the transactions occurring after the initial contract was signed. These cases post-date *Danza* relied on by Defendants. Like *Danza*, Defendants' other cases did not involve revenue sharing and are therefore inapplicable. *See*, *e.g.*, *Markham*, 88 F.4th at 612 (challenging a one-time termination fee); *UFCW Loc. 56 Health & Welfare Fund v. Brandywine Operating P'ship, L.P.*, No. 5-CV-2435, 2005 WL 3555390, at *3 (D.N.J. Oct. 28, 2005) (involving a "lessor of office space with no other relationship to the Fund.").

As with *Sweda*, the Third Circuit's prior assumption in Danza regarding "the definition of a 'party in interest,' [that] Congress intended to capture" has been overturned as a misinterpretation that incorrectly excludes routine, necessary service providers. MTD at 18 (quoting *Danza*, 533 F. App'x at 125-26). *See Cunningham*, 604 U.S. at 697, 705. The same is true for the Fifth Circuit's holding in *Markham,* although by the time the Class Period started, Alight did "have a preexisting relationship with a plan" because of the amended contract. MTD at 18 (quoting *Markham*, 88 F.4th at 610). *Cunningham* reversed the Second Circuit's misinterpretation of Congress's implied intent for § 1106(a) which is "straightforward " as written. *Cunningham*, 604 U.S. at 704-05 (citation omitted).

39

Courts must stick only to "§ 1106(a)(1)(C)'s plain text[,]" *id*., at 708-09, which "*does not say that the contract that causes the service provider to be a party in interest must be different than the prohibited transaction.*" *Comerica Bank for DALRC Retiree Benefit Tr. v. Voluntary Emp. Benefits Assocs., Inc*., No. 09-CV-1164, 2012 WL 12948705, at \*18 n. 27 (N.D. Ga. Jan. 11, 2012) (emphasis added). "[T]he legislative history reveals Congress was *specifically* concerned with the danger that a Plan would become lo*cked into a long-term, disadvantageous service contract*" which "is only addressed if every service contract is required to be reasonable, rather than just successive contracts." *Id*. (emphasis added). Plaintiff's prohibited transaction claim is plausibly alleged.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' motion to dismiss Plaintiffs' Complaint, or in the alternative grant Plaintiffs leave to amend.

Dated: November 24, 2025          Respectfully submitted,

/s/ Mark K. Gyandoh
Mark K. Gyandoh, Esquire
New Jersey Bar No. 025622001
James A. Maro, Esquire
New Jersey Bar No. 017052000
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
Email: markg@capozziadler.com
          jamesm@capozziadler.com

40

Tel.: (610) 890-0200

*Counsel for Plaintiff and the Putative Class*

## CERTIFICATE OF SERVICE

I hereby certify that on November 24, 2025, a true and correct copy of the foregoing document was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.

By: */s/ Mark K. Gyandoh*